**24.3.5 Entry Blocked or Obstructed.**

**24.3.5.1** The entrance to a structure or to the property may be blocked or obstructed to hamper fire fighters from extinguishing the fire. Obstructions to the property may include fallen trees, street barricades, or construction features that deny fire vehicle access, such as masonry columns, fences, and gates.

**24.3.5.2** Obstructions to the structure may include what appear to be "security" measures, such as boarded up windows and doors, "security grilles," and chains and locks.

**24.3.6 Sabotage to the Structure or Fire Protection Systems.**

**24.3.6.1 Introduction.** Sabotage refers to intentional damage or destruction to the physical structure of the building, or intentional damage to a fire protection system or system components.

**24.3.6.1.1** A firesetter is often intent on developing conditions that will lead to the rapid and complete destruction of the building or its contents. In order to fulfill this goal, the firesetter may sabotage the structure (fire-resistive assembly) or the fire protection systems.

**24.3.6.1.2** Investigators should determine whether the failure of structural components or fire protection systems was the result of deliberate sabotage or other factors, such as improper construction, lack of maintenance, systems shutdown for maintenance, improper design, or equipment or structural assembly failure.

**24.3.6.2 Damage to Fire-Resistive Assemblies.** Fire-resistive design, accomplished through the construction of various fire resistance–rated assemblies (e.g., walls, ceilings, and floors) and the proper protection of openings (e.g., fire doors, windows and shutters, and fire dampers), is intended to separate portions of a structure into "compartments" or "fire areas" that confine a fire within the "compartment" in which the fire originated, preventing smoke and fire movement to other portions of the building.

**24.3.6.2.1** Penetrations in fire-resistant assemblies may be an indication that the firesetter attempted to spread the fire from one area to another. The investigator should try to determine whether the penetrations occurred with the intent of spreading the fire. Penetrations of fire resistance–rated construction may be the result of poor initial construction, renovations, service wiring, or cables, or may be the result of fire-fighting activities, such as ventilation or overhaul.

**24.3.6.2.2** Open doors are the most common method of fire travel through a structure. Sabotage to fire or smoke doors (e.g., wedging doors open) or fire shutters can increase fire and smoke spread throughout the structure. Sabotage to stairway doors can further increase rapid smoke and fire spread. However, frequently these doors are held or propped open by building occupants to improve ventilation or access during regular building operations. The investigator should determine whether the doors and other opening protection were intentionally opened by the firesetter or were open as a normal operational use of the building.

**24.3.6.3 Damage to Fire Protection Systems.** Fire protection systems include heat, smoke, or flame detection; alarm and signaling systems; sprinkler and standpipe systems; special extinguishing systems, such as those using carbon dioxide, foam, or halon; and private water mains and fire hydrants.

**24.3.6.3.1** Sabotage to fire protection systems or components can delay notification to occupants and the fire department and can prevent the control or extinguishment of the fire. Such sabotage is intended to allow the fire to develop fully and to create greater destruction.

**24.3.6.3.2** Sabotage can include removing or covering smoke detectors; obstructing sprinklers; shutting off control valves; damaging threads on standpipes, hose connections, or fire hydrants; and obstructing or placing debris in fire department Siamese connections or fire hydrants.

**24.3.6.3.3** Another type of sabotage, although more subtle, is igniting multiple fires (see 24.2.1). In addition to increased destruction from additional fires, multiple fires can have the effect of overtaxing the fire suppression system beyond its design capabilities. Assistance may be needed to determine the design limitations on the fire protection system. (See Section 15.5.)

**24.3.7 Open Windows and Exterior Doors.** Open windows and exterior doors can speed the growth and spread of a fire. When these conditions exist during cold weather or in violation of normal building security, it may be an indicator that someone attempted to provide extra ventilation for the fire. Windows may have been broken out for the same purpose.

**24.4 Other Evidentiary Factors.**

**24.4.1** Once the investigator has completed the fire scene examination and has concluded that the fire was incendiary, there are other evidentiary factors that should be recorded and examined, which may be critical regarding future suspect development and identification.

**24.4.1.1** These evidentiary factors regarding the identification of a suspected firesetter, or the "motive" or opportunity for the fire, cannot be substituted for a properly conducted investigation and determination of the fire's origin and cause.

**24.4.1.2** In the absence of physical evidence of an incendiary fire, the investigator is strongly cautioned against using the discovery or presence of these other evidentiary factors in developing a hypothesis, forming opinions, or drawing conclusions concerning the cause of the fire.

**24.4.2 Analysis of Confirmed Incendiary Fires.** It is through the analysis of confirmed incendiary fires that trends or patterns in repetitive firesetting behaviors may be detected. The key to this analysis is whether the firesetting is repetitive or not. This analysis may assist the investigator in the development and identification of possible suspects. Repetitive firesetting, sometimes called *serial fire setting* or *serial arson*, refers to a series of three or more (incendiary) fires, where the ignition is attributed to the individual or a group acting together. There are three principal trends that may be identified through analysis: geographic areas, or "clusters"; temporal frequency; and materials and methods.

**24.4.2.1\* Geographic Areas, or Clusters.** Repetitive firesetting activities tend to group within the same geographic location (i.e., same neighborhood), or cluster. Locating incendiary fires by utilizing computer-assisted pattern recognition systems, such as the Arson Information Management System (AIMS) or by looking at a map of the local area, can assist the investigator in identifying clusters.

**24.4.2.2 Temporal Frequency.** Incendiary fires set by the same individual often occur during the same time period of the day or on the same day of the week. This occurrence may have several reasons, including the level of activity in the area, the firesetter's assessment of his or her chances of success, or the firesetter's routine. For example, the firesetter may pass the location (to or from work or to or from a bar) during a certain period of the day or on a certain day of the week.

**24.4.2.3 Materials and Method.** The method and material used in the ignition of incendiary fires vary according to the firesetter. Generally, however, once a firesetter begins repetitive firesetting behavior, the materials and method tend to remain similar, as do the locations of the incendiary fires.

**24.4.3 Evidence of Other Crimes, Crime Concealment.**

**24.4.3.1** An incendiary fire may be an attempt to conceal other crimes, such as homicides and burglaries. In other cases, a staged burglary may occur to disguise an incendiary fire. The issue of which occurred first, the other crime or the fire, is more related to the motive for the fire and has little to do with the cause of the fire.

**24.4.3.2** Although possible motives do not determine a fire's cause (i.e., if the motive was to burglarize the structure and to conceal the burglary with a fire, or to set a fire but make it appear as a burglary), motives may lead the investigator to approach the investigation (i.e., the search for evidence) and possible suspects differently.

**24.4.4 Indications of Financial Stress.** The investigation may reveal indicators of financial stress. These indicators may include the following: liens, attachments, unpaid taxes, mortgage payments in arrears, real estate for sale (inability to sell, property is nonmarketable, etc.), poor business location, or new competition.

**24.4.4.1** Financial stress may also be indicated by factors associated with the use or type of occupancy of the building. For business occupancies, indicators may include periods of economic decline, particularly within that industry; changes within an industry, in either product or equipment; obsolescence of equipment; and new competition within the industry. Other indicators can include factors such as the need to relocate or new competition in the same geographic region or area.

**24.4.4.2** Examples of financial stress for residential properties can include landlords who cannot collect rent or who cannot rent out vacant units, rent control, the owner's need to relocate, and mass loss of jobs within the region resulting from industrial cutbacks or closings.

**24.4.5 Existing or History of Code Violations.**

**24.4.5.1** Closely related to, and possibly another indication of financial stress, is the existence of or a history of building, fire safety, housing, or maintenance code violations. This may indicate either the financial inability to maintain the building or the intentional choice to let the building deteriorate (refusal to reinvest in the structure).

**24.4.5.2** Where the deterioration of a building is intentional, other indicators related to financial stress, such as overinsurance or the inability to sell the property, may be discovered during the investigation.

**24.4.6 Owner with Fires at Other Properties.** If a structure is owned by persons who have had incendiary fires at other properties, especially if they have collected insurance as a result of those fires, there is a possibility they will experience another incendiary fire.

**24.4.7 Overinsurance.** Another indicator closely related to financial stress is overinsurance. Overinsurance is a condition whereby the insurance coverage is greater than the value of the property in a valued policy state or whereby there are multiple insurance policies on the property.

**24.4.8 Timed Opportunity.** Timed opportunity refers to the indicators that a firesetter has timed the fire to coincide with conditions or circumstances that assist the chances of successful destruction of the target (property) or to utilize those conditions or circumstances to increase the chances of not being apprehended.

**24.4.8.1 Fires During Severe Natural Conditions.** Fires during periods of extreme natural conditions such as floods, snowstorms, hurricanes, or earthquakes may delay fire department response or hinder fire-fighting capabilities. Other natural conditions to note are electrical storms, periods of high winds, low humidity, and freezing or extremely high temperatures.

**24.4.8.2 Fires During Civil Unrest.** This is a type of opportunistic fire. Other indicators, such as financial stress, often accompany this indicator.

**24.4.8.2.1** Also, incendiary fires during civil unrest usually do not involve elaborate ignition devices or materials, although "fire bombs" or liquid accelerants are sometimes used. More often, available materials are utilized as an initial fuel.

**24.4.8.2.2** A similar pattern may develop when *repetitive fires* or a series of incendiary fires occur in the same geographic area *(see 24.4.2.1)*. The owners or occupants may attempt to set a fire and have the cause attributed to another firesetter. In these instances, the investigator may discover a difference in the method (such as time of day, days of the week, location of the fire), the materials (such as different fuels) used, or ignition source that does not fit the established firesetting pattern. *(See 24.4.2.)*

**24.4.8.3 Fire Department Unavailable.** Fires may be set at times when the fire department is unavailable. Examples include deliberately calling in a false alarm to get the fire department away from the area or starting the fire while there is a working fire in progress or when the fire department is involved in a parade or other community function.

**24.4.9\* Motives for Firesetting Behavior.**

**24.4.9.1 General.** Motive indicators should not be included or substituted as analytical elements of the fire scene for the purpose of determining or classifying the fire cause. The proper use of motive indicators in the fire investigation process is in identifying potential suspects only after the fire origin and cause have been determined and the fire has been classified as incendiary.

**24.4.9.1.1** *Motive* is defined as an inner drive or impulse that is the cause, reason, or incentive that induces or prompts a specific behavior. The identification of an offender's motive is a key element in crime analysis. Crime analysis is a method of identifying personality traits and characteristics exhibited by an unknown offender. It is the identification and analysis of the personality traits that eventually lead to the classification of a

motive. Once a possible motive is identified, the investigator can begin to evaluate potential suspects for the incendiary fire.

**24.4.9.1.2** Behaviors related to the classifications of motive may not be exclusive to one motive classification but may appear to overlap categories and to be similar for different motives. In these instances, it is important to obtain additional information that may clarify the behaviors.

**24.4.9.1.3** In addition to the identification of a motive, other analyses should be considered that might assist in determining if a serial firesetter exists. Through the analysis of confirmed incendiary fires, trends or patterns in repetitive firesetting behaviors may be detected. The three principal trends that may be identified are geographic clustering, temporal frequency, and methods and materials. *(See 24.4.1.)*

**24.4.9.2 Motive Versus Intent.** There is an important distinction to be made between motive and intent. *Intent* refers to the purposefulness or deliberateness of the person's actions or, in some instances, omissions. It also refers to the state of mind that exists at the time the person acts or fails to act. Intent is generally necessary to show proof of crime. The showing of intent generally means that some substantive steps have been taken in perpetuating the act. *Motive* is the reason that an individual or group may do something. It refers to what causes or moves a person to act or not to act and the stimulus that causes action or inaction. Motive is generally not a required element of a crime. For example, a person with indications of "financial difficulty" could experience a fire to his insured property that is ignited by his falling asleep with a lit cigarette. While this person may have motive to cause a fire, that person did not intend to have a fire. Thus, no element of intent existed.

**24.4.9.3\*  Classifications of Motive.**

**24.4.9.3.1 Introduction.** The classifications discussed in this chapter are those identified in Douglas et al., *Crime Classification Manual* (CCM). The CCM uses a diagnostic system intended to standardize terminology and formally classify the critical characteristics of the perpetrators and the victims of the three major violent crimes: murder, arson, and sexual assault.

**24.4.9.3.1.1** The CCM identifies analytical factors that have been identified as essential elements in order to classify the motive of an offense. These factors include information about the victim, the crime scene, and the nature of the victim–offender exchange. Not all the information will be, or should be expected to be, present in every case. The intent is to provide the fire investigator with as much information as possible.

**24.4.9.3.1.2** The behaviors that may identify a possible motive, and thus a possible suspect, apply whether the fire is the result of a one-time occurrence or multiple occurrences, such as with a repetitive or serial firesetter. There are three classifications of repetitive firesetting behavior. These are identified as serial arson, spree arson, and mass arson. The terminology used in classifying a repetitive firesetter is similar to the terminology used in murderers. *Serial arson* involves an offender who sets three or more fires, with a cooling-off period between the fires. *Spree arson* involves an arsonist who sets three or more fires at separate locations with no emotional cooling-off period between fires. *Mass arson* involves an offender who sets three or more fires at the same site or location during a limited period of time.

**24.4.9.3.1.3** The National Center for the Analysis of Violent Crime (NCAVC) has identified the six motive classifications as the most effective in identifying offender characteristics for firesetting behavior, as follows:

(1) Vandalism
(2) Excitement
(3) Revenge
(4) Crime concealment
(5) Profit
(6) Extremism

**24.4.9.3.2 Vandalism.** Vandalism-motivated firesetting is defined as mischievous or malicious firesetting that results in damage to property. Common targets include educational facilities and abandoned structures, but also include trash fires and grass fires. Vandalism firesetting categories include willful and malicious mischief and peer or group pressure.

**24.4.9.3.2.1 Willful and Malicious Mischief.** These are incendiary fires that have no apparent motive or those that seemingly are set at random and have no identifiable purpose. These are fires that are often attributed to juveniles or adolescents.

**24.4.9.3.2.2 Peer or Group Pressure.** Recognition or pressure from peers is sometimes regarded as a reason for firesetting, particularly among juveniles.

**24.4.9.3.3\*  Excitement.** The excitement-motivated firesetter may enjoy the excitement that is provided by actual firesetting or the activities surrounding the fire suppression efforts, or may have a psychological need for attention. The excitement-motivated offender is often a serial firesetter. This firesetter will generally remain at the scene during the fire and will often get in position to respond to, or view the fire and the surrounding activities. The excitement-motivated firesetter's targets range from small trash and grass fires to occupied buildings.

**24.4.9.3.3.1** The excitement-motivated firesetter includes the following subcategories.

**(A)  Thrill Seeking.** Setting a fire provides this offender with feelings of excitement and power. The thrill-seeking firesetter is often a repetitive firesetter, who compulsively sets fires to satisfy some psychological desire or need.

**(B)  Attention Seeking.** These firesetters have a need to feel important, and they set fires in order to satisfy a psychological need.

**(C)  Recognition.** These firesetters are sometimes described as the hero or vanity firesetter. These firesetters often remain at the fire scene to warn others, report the fire, or assist in firefighting efforts. They enjoy or may seek the recognition and praise they receive for their efforts. Typical among these firesetters are security guards and fire fighters. Occasionally these firesetters may even take responsibility for setting the fire.

**(D)  Sexual Gratification or Perversion.** These are firesetters who set fires as a means of sexual release. The firesetter in this category is considered rare.

**24.4.9.3.3.2** Attention-seeking, recognition, and sexual-gratification firesetters rarely attempt or intend to harm people, but these firesetters may disregard the safety of innocent bystanders or occupants. However, the thrill-seeking offender, whose compulsion requires the inherent sense of satisfaction, will often set a big fire or a series of fires. Fires will

typically involve structures, but when vegetation is involved, these fires are also large.

**24.4.9.3.4\* Revenge.**

**24.4.9.3.4.1** The revenge-motivated firesetter retaliates for some real or perceived injustice. An important aspect is that a sense of injustice is perceived by the offender. The event or circumstance that is perceived may have occurred months or years before the firesetting activity. A fire by the revenge-motivated offender may be a well-planned, one-time event or may represent serial firesetting, with little or no pre-planning. Serial offenders may direct their retaliation at individuals, institutions, or society in general.

**24.4.9.3.4.2** Subcategories of revenge firesetting include personal, societal, institutional, and group retaliation.

**(A) Personal Retaliation.** The triggering event for this motive may be an argument, a fight, a personal affront, or any event perceived by the offender to warrant retaliation. Favorite targets include the victim's vehicle, home, or personal possessions. The specific location and the materials involved in the fire may be a significant factor in identifying the offender. Igniting clothing or other personal possessions is seen as a more personal affront to the victim than simply setting a fire in a common area. The fire scene may also be vandalized. These fires may be a one-time event or an act of serial arson.

**(B) Societal Retaliation.** This offender usually suffers from a feeling of inadequacy, loneliness, persecution, or abuse. The societal retaliation offender generally is not satisfied with a single fire or even a series of fires. Therefore, this serial offender is likely to set many more fires than other revenge-motivated firesetters.

**(C) Institutional Retaliation.** This classification of offender targets institutions such as religious, medical, governmental, and educational institutions, or corporations. The firesetter may be a disgruntled employee, a former employee, a customer, or a patient.

**(D) Group Retaliation.** Targets for group retaliation may be religious, racial, fraternal, or other groups, including gangs. Graffiti, symbols or markings, and other vandalism may accompany the fire.

**24.4.9.3.5\* Crime Concealment.** This category involves firesetting that is a secondary or a collateral criminal activity, perpetrated for the purpose of concealing the primary criminal activity. In some cases, however, the fire may actually be part of the intended crime, such as revenge. Many people erroneously believe that a fire will destroy all physical evidence at the crime scene. Categories for crime concealment firesetting include murder or burglary concealment and destruction of records or documents.

**(A) Murder Concealment.** This scenario is where a fire is set in an attempt to conceal the fact that a homicide has been committed, to destroy forensic evidence that may identify the offender, or to conceal the identity of the victim.

**(B) Burglary Concealment.** This is a fire that is set in an attempt to conceal the fact that a burglary has occurred or to destroy forensic evidence that may identify the offender.

**(C) Destruction of Records or Documents.** This is a fire that targets records or documents. These fires may involve files ignited still in their folders or an origin inside a file cabinet. It may involve ordinary combustibles located in an exposure position to the files, such as a trash can moved adjacent to the files. Potential suspects in these incidents involve those who have some interest in the documents or records that were targeted.

**24.4.9.3.6\* Profit.** Fires set for profit involve those set for material or monetary gain, either directly or indirectly. The direct gain may come from insurance fraud, eliminating or intimidating business competition, extortion, removing unwanted structures to increase property values, or from escaping financial obligations.

**24.4.9.3.6.1** The broad category of fraud is frequently identified as an arson motive. However, fraud is classified as a subcategory in the profit motive category. Fraud-motivated fires may include commercial or residential properties. Commercial fraud fires may be set or arranged by an owner to destroy old or antiquated equipment, to destroy records to avoid taxes or audits, or for the purpose of obtaining insurance money. Fires may be set by a competitor to gain market advantage, or by agents of organized crime for purposes of extortion, protection rackets, or intimidation. Residential fraud may include an owner intending to defraud an insurance carrier, or a tenant defrauding an owner or a welfare agency. Increasing taxes, physical deterioration (and legally mandated repairs such as by code enforcement agencies), vacancy or inability to rent, or statutory rent-control measures may be reasons for a landlord to consider burning the structure.

**24.4.9.3.6.2** There are several subcategories that further identify fraud as a motive. These include fraud to collect insurance, fraud to liquidate property, fraud to dissolve a business, and fraud to conceal a loss or liquidate inventory. The other categories include employment, parcel/property clearance, and competition.

**24.4.9.3.7\* Extremism.** Extremist-motivated firesetting is committed to further a social, political, or religious cause. Fires have been used as a weapon of social protest since revolutions first began. Extremist firesetters may work in groups or as individuals. Also, due to planning aspects and the selection of their targets, extremist firesetters generally have a great degree of organization, as reflected in their use of more elaborate ignition or incendiary devices. Subcategories of extremist firesetting are terrorism and riot/civil disturbance.

**(A) Terrorism.** The targets set by terrorists may appear to be at random; however, target locations are generally selected with some degree of political or economic significance. Political targets generally include government offices, newspapers, universities, political party headquarters, and military or law enforcement installations. Political terrorists may also target diverse properties such as animal research facilities or abortion clinics. Economic targets may include business offices, distribution facilities of utility providers (e.g., atomic generation plants), banks, or companies thought to have an adverse impact on the environment. Fires or explosions become a means of creating confusion, fear, or anarchy. The terrorist may include fire as but one of a variety of weapons, along with explosives, used in furthering his or her goal.

**(B) Riot/Civil Disturbance.** Intentionally set fires during riots or civil disturbances may be accompanied by vandalism and looting. It is worth noting that all fires ignited during periods of civil unrest may not be the result of the extremist firesetter but may be set by others, such as owners, hoping that the fire is attributed to the extremist firesetter and the circumstances surrounding the civil disturbance.

### Chapter 25  Fire and Explosion Deaths and Injuries

**25.1 General.** Each year, thousands of people are injured or die in fire- and explosion-related incidents. The investigation of fire- and explosion-related deaths and injuries require the utilization of specialized skills that are not typically used during routine fire investigations. These skills may include subsets of toxicology, pathology, and human behavior, among others. The data from the deaths and injuries of fire victims may provide information related to the nature and development of a fire.

**25.2*  Mechanisms of Death and Injury.** The combustion products arising from a fire are many, and their effects on healthy individuals vary; however, none are without toxicological effects. The inhalation of these products or contact with skin or eyes can result in deleterious biological effects, such as immediate irritation of the eyes and respiratory tract or systemic effects that influence other functions of the body. These combustion products include carbon monoxide, hydrogen cyanide, carbon dioxide, nitrogen oxides, halogen acids (hydrochloric, hydrofluoric, and hydrobromic acids), acrolein, benzene, particulates (ash, soot), and aerosols (complex organic molecules resulting from pyrolysis products).

**25.2.1*  Carbon Monoxide.** Carbon monoxide (CO) is produced at some level in virtually every fire. All carbon-based fuels (e.g., wood, paper products, plastics) produce carbon monoxide as a result of incomplete combustion. During burning of organic fuels, CO is initially formed and then subsequently oxidized to carbon dioxide ($CO_2$). In underventilated fires or in fires where the initial products of combustion mix with colder gases (such as in smoldering fires), conversion of CO to $CO_2$ can be halted, and CO can become a major product of combustion. In well-ventilated fires, the level of CO produced may be as little as a few hundred parts per million (i.e., 0.02 percent). However, in under ventilated, smoldering, or post flashover fires, CO concentrations of 1 percent to 10 percent (10,000 ppm to 100,000 ppm) can be produced. Elevated CO concentrations can also develop during fire suppression.

**25.2.1.1*** Carbon monoxide acts as a central nervous system depressant. When inhaled, CO binds with hemoglobin in the blood, creating carboxyhemoglobin ($COH_b$). The affinity of carbon monoxide for hemoglobin is approximately 240–250 times more than the affinity of oxygen for hemoglobin. Therefore, the blood can accumulate dangerous levels of $COH_b$ from even low CO concentrations in the air.

**25.2.1.2** Although carbon monoxide has asphyxiating effects, it is more powerful than an asphyxiant. Carbon monoxide not only reduces the oxygen-carrying capacity of the blood, as it binds with hemoglobin, it causes a shift in the dissociation curve which affects the ability of the blood to release bound oxygen to the tissues. CO delivered to the cells interferes with cellular respiration, causing incapacitation and death. The binding of carbon monoxide to hemoglobin is reversible.

Carbon monoxide can be eliminated from the body by breathing fresh air or oxygen. In cases of high carboxyhemoglobin levels, however, hyperbaric chambers are used to expedite the elimination of the toxicant from the body. The rate of elimination of carbon monoxide from the body, therefore, is dependent on the oxygen concentration in the air and pressure. For examples, individuals treated with 100 percent oxygen will eliminate the toxicant more quickly than those breathing room air (21 percent oxygen).

**25.2.1.3*** Because carboxyhemoglobin is so stable, it can be readily measured in the blood of fire victims, even long after death. The average fatal level of blood CO is widely accepted as 50 percent $COH_b$. However, fire victims have died from CO exposure with a blood $COH_b$ level as low as 20 percent and as high as 90 percent. Victims with less that 20 percent $COH_b$ most likely died from other causes, such as a lack of oxygen, cardiac arrest, or thermal burns. In contrast, victims with $COH_b$ concentrations of 40 percent or higher are likely to have died from carbon monoxide alone or in combination with other factors (such as age, alcohol, or a heart condition) or may simply have been incapacitated sufficiently by carbon monoxide poisoning to be unable to flee the fire.

**25.2.1.4*** In assessing the significance of a victim's $COH_b$ level, it should be noted that carbon monoxide is produced endogenously in the body due to the break down of hemoglobin to bile pigments in the liver. CO can also enter the body from environmental and habitual sources. A test of 3022 transfusion blood samples for $COH_b$ levels found that 65 percent were below 1.5 percent, 26.5 percent were between 1.5 percent and 5 percent, 6.7 percent were between 5 percent and 10 percent, and 0.3 percent were in excess of 10 percent. A smoker may be exposed to CO levels in the range of 400–500 ppm during the average 6 minute duration that it takes to smoke a cigarette. As such, smokers typically have a $COH_b$ range of 3 percent–8 percent with an average baseline of 4 percent. Heavy smokers (greater than 2 packs per day) can reach levels as high as 15 percent. Nonsmokers average approximately 1 percent $COH_b$ in their blood.

**25.2.1.5*** The $COH_b$ level of a fire survivor begins to decrease as soon as the person is removed from the fire environment. The rate at which CO is eliminated from the body is dependent on the oxygen concentration of the air being breathed. The concentration of CO in the blood ($COH_b$ saturation) will be decreased by one-half ($COH_b$ half-life), for example, reducing $COH_b$ from 45 percent to 22 percent in 250 minutes to 320 minutes at ambient $O_2$ levels in air (21 percent). $COH_b$ half-life is approximately 45 minutes to 90 minutes when a near 100 percent oxygen concentration is administered during emergency medical treatment. Hyperbaric oxygen treatment can reduce $COH_b$ half-life to approximately 20–30 minutes.

**25.2.1.6*** In determining the significance of the victim's $COH_b$ level, the investigator should consider the effects of any medical treatment that the victim received prior to succumbing to their injuries. Individuals that received pulmonary resuscitation or were breathing and administered oxygen therapy prior to death will have a lower $COH_b$ level than was present when they were removed from the fire environment. Therefore, knowledge of the time elapsed between removal from the fire and death and the duration and type of oxygen therapy used, e.g., non-rebreather, nasal cannula, hyperbaric chamber, prior to blood sampling are important data to gather.