# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

VERSUS

SALEEM YOUSEF DABIT, a/k/a "Sam Dabit"

CRIMINAL ACTION

NO. 19-143-JWD-RLB

## RULING AND ORDER

This matter comes before the Court on two motions *in limine*. The first is *Defendant's Motion for Pretrial Ruling on the Admissibility of Evidence* (Doc. 136). The Government opposes Defendant's motion. (Doc. 144.) Defendant filed a reply, (Doc. 146), and the Government filed a surreply, (Doc. 151.) The second is the *Motion in Limine to Exclude Evidence of Other Arsons* (Doc. 143) filed by the United States, which Defendant opposes (Doc. 145). The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, Defendant's motion is denied in part and denied as moot in part, and the Government's motion is granted in part and denied in part.

## I. THE AMENDED INDICTMENT (DOC. 64)

Defendant is charged by way of an amended indictment with committing three crimes. (Doc. 64). Count One charges Defendant with using a fire to commit a felony in violation of 18 U.S.C. § 844(h)(1). (*Id.* at 3.) Count Two charges Defendant with use of fire to maliciously damage property in violation of 18 U.S.C. § 844(i). (*Id.*) And Count Three charges Defendant with wire fraud in violation of 18 U.S.C.§ 1343. (*Id.* at 3–6.)

More specifically, the Indictment alleges that Defendant owned and operated Sam's Men's Fashions, which was a retail men's clothing store on Plank Road in Baton Rouge, Louisiana. (*Id.* at 1.) Defendant allegedly lived in a residence next to the business in the same building. (*Id.*)

Defendant had insurance through Hanover Insurance Group ("Hanover") which covered (1) the property where Sam's Men's Fashions operated; (2) business personal property like furniture, computers, office supplies, and inventory; and (3) lost business income associated with the physical loss, damage, or destruction of the property. (*Id.* at 1–2.) The Hanover policy named Defendant as the insured; described Sam's Men's Fashions as the covered property; and insured the building for $778,131, the business personal property for $700,000, and covered any actual business loss sustained not exceeding a period of 12 consecutive months. (*Id.* at 2.)

Defendant also had certain obligations under the Hanover Policy in the event of property loss or damage. (*Id.*) These obligations included the duty to truthfully report how, when, and where the loss or damage occurred and to provide truthful factual information during the insurer's investigation of the claim. (*Id.*)

However, the policy specifically excluded any loss or damage caused by any dishonest or criminal act by Defendant. (*Id.*) Further, the policy said it would be considered void in the event of fraud by Defendant or if Defendant intentionally concealed or misrepresented any material fact concerning the property or any claim under the policy. (*Id.*)

The Louisiana Changes endorsement to the policy specifically excluded and did not provide coverage arising out of any act committed by Defendant or at his direction with the intent to cause a loss. (*Id.*) This endorsement also stated that the policy would be rendered void with respect to loss or damage caused by fire if Defendant concealed or misrepresented any material fact or circumstance about the property or any claim under the policy. (*Id.*)

Count One charges that, on January 1, 2019, Defendant did knowingly use fire to commit a felony, namely, wire fraud in violation of 18 U.S.C.§ 1343, as charged in Count Three of the Indictment. (*Id.* at 3.)

Count Two alleges that, on the same day, Defendant did maliciously damage and attempt to damage and destroy, by means of fire, real property used in interstate commerce, that is, Sam's Men's Fashions. (*Id.*)

Count Three charges Defendant with wire fraud. (*Id.*)  In a paragraph entitled "Scheme to Defraud," the Indictment alleges that, beginning around December 2018 until February 2019, Defendant "devised and intended to devise a scheme to defraud, and to obtain money and property from Hanover by means of materially false and fraudulent pretenses, promises and representations, and for the purpose of executing the scheme, did knowingly make, and cause to be made, at least one wire communication in interstate commerce." (*Id.* at 4.)  The stated "Purposes of the Scheme" were "to defraud, and to obtain funds from Hanover to which [Defendant] was not entitled, by means of materially false and fraudulent pretenses, promises, and representations" and "to personally enjoy, benefit from, and unjustly enrich himself through the use of such funds to which he was not entitled." (*Id.*)

The Indictment alleges a number of manner and means by which Defendant sought to accomplish the purposes of his scheme to defraud. (*Id.* at 4–6.)  Specifically, on January 1, 2019, at about 5:30 a.m., Defendant allegedly set fire to Sam's Men's Fashions with gasoline from at least 15 containers. (*Id.* at 4.)  This resulted in a massive fuel-air explosion. (*Id.*) The Indictment states that Defendant did so with the intent to damage and destroy his property and collect on his Hanover commercial property and business interruption insurance.  (*Id.*)

Almost immediately, Defendant made a formal, allegedly false claim to Hanover to have his insurance cover the loss from the fire, and for weeks thereafter, made materially false and fraudulent representations to fire scene and financial investigators about the cause of the fire and his business finances that would support payment of the claim. (*Id.* at 4–5.)  More specifically, on

January 2, 2019, Defendant purportedly called Hanover to make a claim for the fire loss or damage at his property and falsely told the claim agent that an electrical problem had probably caused the fire when, in fact, he knew he had intentionally set the fire himself. (*Id.* at 5.)

Further, according to the Indictment, Defendant continued to violate the terms of his policy and made a number of fraudulent statements to investigators about the fire to support his initial claim for insurance money. (*Id.*)

- On January 2, 2019, Defendant falsely told investigators with the Baton Rouge Fire Department ("BRFD") and Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") that he was awakened on the morning of the fire when firefighters entered his adjoining residence to rescue him. (*Id.*)

- Around January 29, 2019, after several empty and burdened gasoline containers were discovered at the fire scene, defendant falsely told an investigator for Hanover that intruders must have broken into the business with those items and set the fire. (*Id.*)

- On or about January 30, 2019, Defendant fraudulently reiterated to BRFD and ATF investigators that intruders must have broken into the business with gasoline containers and set the fire. (*Id.*)

- Around January 31, 2019, Defendant fraudulently told investigators for Hanover, the BRFD, and ATF that intruders must have broken into the business through a loose metal panel on the roof with the gasoline containers and set the fire. (*Id.* at 6.)

- Later, on or about February 8, 2019, Defendant falsely told BRFD and ATF investigators that a former handyman and his friends must have broken into the business through a loose metal panel on the roof with the gasoline containers, set the fire, and then exited through the same opening in the room. (*Id.*)

- On or about the same day, Defendant falsely told investigators with BRFD and the ATF that he was awakened on the morning of the fire when firefighters entered his adjoining residence to rescue him and that he did not hear the explosion or anything prior to their arrival. (*Id.*)

Finally, the Indictment alleges that Defendant knowingly transmitted and caused to be transmitted in interstate commerce, by means of a wire communication, certain signals and

sounds—i.e., a telephone call to a Hanover claims center outside of Louisiana to report the fire at Sam's Men's Warehouse and to make a claim for money on his commercial property and business interruption insurance policies. (*Id.*)

## II.   DEFENDANT'S MOTION (DOC. 136)

### A.  Overview

Defendant seeks the admission of two pieces of statements which are alleged to contain hearsay. (Doc. 136 at 1.)  In the first statement, a man named "Anthony" threatened to shoot Defendant and burn down Defendant's business six months before the fire in June 2018. (Doc. 136-1 at 1–2.) In the second, an unknown witness purportedly told Captain Levert Kemp of the Baton Rouge Fire Department that, on the morning of the fire, another individual heard a boom coming from Sam's store and heard tires squealing. (*Id.* at 1.)  Defendant also raises the issue of a possible *Brady* violation and spoliation of evidence. (*Id.* at 6–7.)  The Court will address Anthony's statement first and then turn to Kemp.

### B.  Anthony's Alleged Threat

#### *1. Parties' Arguments*

On this issue, Defendant submits a police report reflecting that Defendant reported the threat. (Doc. 136-1 at 1–2.)  However, the whereabouts of Anthony are unknown. (*Id.* at 2 n.1.)  Defendant argues that he should be able offer the statement if Defendant chooses to testify at trial (*Id.* at 2.)  Defendant contends that Anthony's statements would fall under the Federal Rule of Evidence ("Rule") 803(3) hearsay exception for the declarant's then existing state of mind. (*Id.*)  Such statements show motive, intent, or plan. (*Id.*)  Further, these statements would come in as statements against interest under Rule 804(b)(3), as (1) Anthony is unavailable; (2) the statements are contrary to his pecuniary/proprietary interests; (3) the statements would expose him to criminal

5

liability; and (4) there are other corroborating circumstances, namely that one or two other employees overheard the conversation. (*Id.*)    Even if Defendant does not testify, Defendant maintains that this evidence is admissible under Rule 807 because (1) there are guarantees of trustworthiness; and (2) the evidence is more probative of other evidence that could be obtained through reasonable efforts (as, again, (a) it was overheard by others, (b) documented in a BRPD report, and (c) Anthony is unavailable and cannot be located). (*Id.* at 2–3.)

The Government concedes that any statement by the disgruntled employee would fall under the state of mind hearsay exception, but the Government goes on to say that Defendant needs testimony of someone with firsthand knowledge (i.e., that heard the statement) to get the statement in. (Doc. 144 at 3.) Defendant would not be able to introduce the statements through the police officer or police report because that would be hearsay within hearsay. (*Id.* at 4.)    Further, the residual Rule 807 hearsay exception is not applicable because (1) the statements were not particularly trustworthy (i.e., Defendant could have lied to the police); (2) there is no corroboration that the statements were true (e.g., people lie in police reports); and (3) the evidence is not more probative of other evidence obtained through reasonable means, like the testimony of other employees who allegedly heard the threats. (*Id.* at 5–6.)  The Government concludes, "The bottom line is that defendant can elicit testimony about Anthony's alleged threat through any witness who heard the threat but not otherwise." (*Id.* at 6.)

Defendant filed a reply in which he says that he "agrees with the prosecution on this issue." (Doc. 146 at 3.)  "Clearly if Mr. Dabit chooses to testify he will be allowed to tell the jury what Anthony told him. Additionally, if there was a witness who heard specifically what Anthony said, that witness would be allowed to say what they heard Anthony say." (*Id.*)

### 2. Law and Analysis

Both sides are in agreement on this issue, so there is nothing for the Court to decide; the statements made by Anthony will be admitted as an exception to the hearsay rule if offered by Dabit or another witness who heard what Anthony said. Accordingly, the motion is denied as moot on this issue.

### C. Statement Regarding Squealing Tires

#### 1. Parties' Arguments

##### a. Defendant's Memorandum in Support (Doc. 136-1)

Defendant begins by highlighting some of the facts underlying his motion. (Doc. 136-1 at 3.) According to Defendant, he has insisted since the beginning that arsonists may have snuck in through a loose tin roof panel on the south side of the building, on the portion immediately adjacent to Beech Street. (*Id.*) The building was being remodeled, and one of the panels was loose and could have been used as an entry point. (*Id.*)

Further, Captain Levert Kemp of the Baton Rouge Fire Department worked closely with the government's two experts, ATF Agent Devin O'Brien and Bo Roberts (Hanover's expert investigator). (*Id.*) Defendant says that Kemp interviewed several residents who lived on Beech Street, and one witness reported that he was smoking outside when he heard a boom and tires squealing. (*Id.* at 4.) The witness was not a resident but was only visiting, and Kemp did not get the witness' name, phone number, or other information. (*Id.*) Kemp reported this information to Roberts, who documented it in his report. (*Id.*) Defendant plans to call Kemp to testify about this statement, but the Government urges that it is hearsay. (*Id.*)

Defendant urges that this information is admissible under several hearsay exceptions. (*Id.* at 4.) First, the statement is an excited utterance under Rule 803(1) and (2), though Defendant

"acknowledges that there clearly is a lapse in time between when this witness heard the boom and the squealing tires and when he made the statement to Captain Kemp" and that "the defense acknowledges that the statement was not made to Kemp while the witness heard the squealing tires nor was he under the stress of the excitement." (*Id.*) However, hearing tires squealing and a boom is "not something that is frequently heard" and is an "unusual, exciting, and perhaps even a stressful event," so the Court should consider this exception.

Second, the event is admissible as a "present sense impression," though "defendant acknowledges" that this exception "generally [applies when] the statement [is] made while the person was perceiving the event or immediately after the person perceives it." (*Id.* at 5.) Again, the circumstances of this statement make the matter trustworthy. (*Id.*)

Third, the statement could fall under the "then existing state of mind" exception of Rule 803(3). (*Id.*) The witness is relaying his feelings about an "unusual, exciting, and perhaps even a stressful event." (*Id.*)

Fourth, Defendant then argues:

> There is no question that Captain Kemp had been told by Mr. Dabit that he, Dabit, thought that the arsonists had come in through the roof entrance on Beech Street. The statements of this unknown witness, that he heard tires squealing supports Mr. Dabit's theory. Undersigned counsel does not know why Kemp failed to obtain the name and contact information of this witness or to follow up with this witness and get a formal statement. However, what is most important about this statement is that it constitutes *Brady* material. It is exculpatory in that it supports Mr. Dabit's consistent position that the arsonists would have entered and exited the building on Beech Street.

(*Id.* at 6.) Defendant also urges that he "may be entitled to a jury instruction on spoliation of evidence" and that a "pre-trial hearing at which Kemp can testify may be necessary to determine Kemp's good or bad faith in failing to obtain this information." (*Id.*)

Fifth, Defendant turns to Rule 804(b)(6). (*Id.*)  Here, the statement is being offered against a party that wrongfully caused or acquiesced in the causing of the unavailability of a witness. (*Id.*)

And sixth, Defendant asserts that the Rule 807 residual exception is applicable:

> First, the statement is supported by sufficient guarantees of trustworthiness – it was given to the Captain of the Fire Department who was investigating this case who in turn reported it to the expert Bo Roberts. Second, it is more probative on the point for which it is offered than any other evidence that the proponent can obtain with reasonable efforts. What is particularly important about this is that this evidence came from the investigators – not from Mr. Dabit. The Government cannot claim this is some self-serving hearsay statement which came from the defense. It is not. Captain Kemp obtained it and felt it important enough to relay it to Mr. Bo Roberts, the expert investigator for Hanover.

(*Id.* at 7.)

#### b.  Government's Memorandum in Opposition (Doc. 144)

On this issue, the Government focuses on an alleged double or triple hearsay nature of this statement: Defendant's insurance company's investigator (Roberts) recorded in some notes that he heard from a Baton Rouge Fire Department officer (Kemp) that a neighbor told the officer that a witness staying with the neighbor was out smoking and heard a boom and tires squeal. (Doc. 144 at 6.)  Kemp left his business card at the neighbor's house but was unable to speak with the witness. (*Id.*)  "When asked about the squealing-tires statement, Captain Kemp reported that he has no recollection of any such statement." (*Id.* at 7.)

The Government systematically goes through the hearsay exceptions and explains why they do not apply—

> (1) no present sense impression exception because Defendant doesn't know when the statement was made, (*id.* at 8);
>
> (2) no excited utterance exception because Defendant did not make the statement while he was "under the stress of the event," (*id.* at 9);

(3) no state of mind exception because Defendant cannot use this exception to prove the fact remembered, only his state of mind (e.g., "I'm scared" is permissible but not "I'm scared because I heard a loud boom"), (*id.* at 10);

(4) no forfeiture by wrongdoing because there is zero evidence Kemp made the witness unavailable but rather, to the contrary, his notes show that he attempted to make contact with the witness but was unable to do so, (*id.* at 11); and

(5) no residual hearsay exception because (a) the statement is not automatically trustworthy because it's made to a fire investigator; (b) the circumstances surrounding the statement being made are entirely unknown; (c) there's no corroboration to the statement, as no other witness to the event reported tires; and (d) no showing that this evidence is more probative than other evidence obtained through reasonable means, (*id.* at 11–12).

Additionally, Defendant needs a witness with personal knowledge to testify about the statement; Kemp did not hear it, so Defendant must overcome this problem. (*Id.* at 12.)

The Government closes by addressing Defendant's *Brady* argument and request for hearing. (*Id.* at 12–19.) The Government says that the evidence is only "potentially exculpatory" at best, as the squealing tires could be from any number of things on Plank Road. (*Id.* at 14.) The Government also argues that the information is not material; the statement is not admissible and could not lead to admissible evidence, and, in any event, the information was disclosed and available for Defendant to use in crafting his defense. (*Id.* at 15.) Further, because the evidence is only potentially useful, Defendant must prove bad faith on Kemp's part in failing to document the statement, and, here, there is absolutely no evidence that Kemp acted in bad faith. (*Id.* at 17.) With only general and conclusory showings, no hearing is required. (*Id.* at 18.) Likewise, without bad faith, no spoliation instruction is required. (*Id.* at 19.)

*c.*   Defendant's Reply Memorandum (Doc. 146)

Defendant asserts that a pretrial hearing should be held. (Doc. 146 at 1.)  The Government stated that there may have been a misunderstanding between Roberts and Kemp or that Kemp's notes may have been wrongly transcribed, so a hearing is necessary to get to the bottom of the matter and clarify the "misunderstanding." (*Id.* (citing Doc. 144 at 7 n.3).)

Defendant concedes that he takes no position on why Kemp did not have the contact information of the witness, and "[t]his is all the more reason for the Court to have a hearing to ask Captain Kemp several questions, including, 1) Did he interview this witness personally? 2) If he didn't, did he get his name, phone number, or other contact information? 3) Did he relay this information to Bo Roberts or does he have any explanation why Bo Roberts would have put this in his report?" (*Id.* at 1–2.)  Further, the Government admits that Kemp made several attempts to contact a witness, and Kemp should have that person's name. (*Id.* at 2.)

Defendant then closes by stating:

> The defense has acknowledged that due to circumstances beyond our control, we cannot say that the statement of the witness who heard the squealing tires was made at or immediately after perceiving these two noises; however, what makes this statement trustworthy is that it is such a startling, unexpected thing to hear. As the Government notes on page 9 of their brief, the excited utterance exception is grounded on the theory that a condition of excitement temporarily stills the capacity of reflection and produces utterances free of conscious fabrication. In other words, these statements were not the product of reflective thought. Granted, they were made probably several hours after the event, but the Court should still consider them as being excited utterances or present sense impressions.
>
> As noted above, the defense is in no position to say Captain Kemp acted in bad faith. Nor do we know at this point why he did not properly document this witness and yet he apparently thought enough about it to relay it to Bo Roberts.

> For all the reasons set forth above, and importantly under FRE 807
> the Court should rule that the statement is admissible. In the
> alternative, the Court should have a hearing at which both Mr.
> Roberts and Captain Kemp can testify.

(*Id.* at 2–3.)

### d.  Government's Surreply (Doc. 151)

The Government asserts first:

> Defendant's reply does not move the needle on admissibility of the
> squealing-tires statement. The reply provides no new facts, no new
> arguments, and no law at all. Things remain as they were when the
> Government filed its opposition—defendant has not established a
> proper foundation for admission of the statement under any hearsay
> exception. As a result, the statement is inadmissible, regardless of
> defendant's (unsupported) assurances that it is "trustworthy."

(Doc. 151 at 1.)

On the *Brady* question, the Government similarly maintains that Defendant has not met his

burden of showing how the squealing tires is material exculpatory evidence or how Kemp acted in

bad faith. (*Id.*)  After citing a number of cases on why a hearing is not required, the Government

then states, "Defendant has made no effort to make a showing of bad faith that would justify a

hearing. His goal in seeking a hearing is admittedly, not to prove bad faith, but to discover whether

there is bad faith. That is not the purpose of a hearing." (*Id.* at 2.)

Despite this, the Government has provided a declaration from Kemp to answer Defendant's

questions as well as Robert's notes referencing the squealing tires. (*Id.* at 3.)  The Government

argues that the declaration shows no bad faith by Kemp. (*Id.*)  "So, not only has defendant failed

to make the appropriate showing, but the Government has submitted evidence that Assistant Chief

Kemp did not act in bad faith. That should put the matter to bed—there is no need for a hearing."

(*Id.*)  The Government then urges the prejudice it would suffer from a hearing before stating that

"defendant has . . . slept on his rights. He has had the Roberts notes about the squealing-tires

12

statement for a year and a half and did nothing about it until a few days ago. His lack of diligence is yet another reason to deny a hearing." (*Id.*)

The Government then closes by urging that no hearing should be granted and that the squealing-tire statement should be excluded. (*Id.* at 4.)

### *2. Law and Analysis*

Having carefully considered the matter, the Court will exclude the statements about the squealing tires as hearsay.  Further, the Court finds no *Brady* violation, no need for a spoliation instruction, and no need for a hearing.  As a result, Defendant's motion on this issue will be denied.

The Court will first address Defendant's shotgun hearsay arguments before turning to the more serious contention on the residual exception.  The Court will then address *Brady*, the need for a hearing, and the spoliation instruction.

#### *a.* Hearsay Generally

" 'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c).  "Hearsay is not admissible unless any of the following provides otherwise: a federal statute; [the Rules of Evidence]; or other rules prescribed by the Supreme Court." Fed. R. Evid. 802. Critically, "[h]earsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805.

#### *b.* Present Sense Impression Exception

The "present sense impression" exception applies to a "statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1).  "The basis for this hearsay exception relies on the contemporaneousness of the event under

consideration and the statement describing that event. Because the two occur almost simultaneously, there is almost no likelihood of [a] deliberate or conscious misrepresentation." *United States v. Polidore*, 690 F.3d 705, 720 (5th Cir. 2012) (cleaned up).

Here, Defendant concedes that he "cannot say that the statement of the witness who heard the squealing tires was made at or immediately after perceiving these two noises," (Doc. 146 at 2), so this exception is not satisfied.

Indeed, the only evidence related to timing is from Kemp's declaration, which shows that the fire happened on January 1, 2019, and Kemp "canvassed the neighborhood and formally interviewed several residents of Beech Street near Sam's" on January 9, 2019. (Doc. 151 ¶¶ 2, 6.) Given this evidence, the statement certainly did not occur "simultaneously" to the event. *See Polidore*, 690 F.3d at 720.  In short, this exception does not apply.

### c. Excited Utterance Exception

Likewise, the "excited utterance" exception applies to a "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2). "The theory of [this] Exception . . . is simply that circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication." Fed. R. Evid. 803, advisory committee notes (citing 6 Wigmore § 1747, p. 135). "Spontaneity is the key factor in each instance, though arrived at by somewhat different routes. Both are needed in order to avoid needless niggling." *Id.*

The "ultimate question is whether the statements were the product of reflective thought or whether they were the result of the startling event." *Webb v. Lane*, 922 F.2d 390, 394 (7th Cir. 1991).  "[T]he amount of time between the startling event and the hearsay statement, although relevant, is not dispositive as to the question of whether the statement is an excited utterance." *Id.*

(citation omitted). "For a statement to qualify as an excited utterance it must be made contemporaneously with the excitement resulting from the event, not necessarily with the event itself." *Id.* (cleaned up).

Since, again, Defendant has little if any evidence of when the statement was made or whether it was made spontaneously or contemporaneously with the witness being under the excitement of the event, the Court finds that Defendant fails to satisfy this exception. *Cf. id.* at 394–95 (finding that "the district court reasonably concluded that [declarant's] statements were not the result of reflective thought" because "[t]he statements followed an extremely violent experience, being shot six times;" because, "[a]t the time [declarant] made the statements he was lying on an emergency room gurney severely injured and under the stress of the attack"; and because, at the time he made a fourth statement one or two hours after the shooting, his "physical suffering serve[d] to prolong the reflection period" and his "shock was renewed when" he was told his "chances of survival did not look good.").

### d.  Then-Existing Mental Condition

The "then-existing mental, emotional, or physical condition" exception generally applies to a "statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed." Fed. R. Evid. 803(3).  As the advisory committee notes explain:

> The exclusion of "statements of memory or belief to prove the fact remembered or believed" is necessary to avoid the virtual destruction of the hearsay rule which would otherwise result from allowing state of mind, provable by a hearsay statement, to serve as the basis for an inference of the happening of the event which produced the state of mind.

Fed. R. Evid. 803, advisory committee's note to 1972 amendment.  Thus, as the Fifth Circuit has explained:

> [Rule 803(3)] by its own terms excepts from the ban on hearsay such statements as might have been made by [declarant] of his then existing state of mind or emotion, but expressly excludes from the operation of the rule a statement of belief to prove the fact believed. The rule thus permitted the witnesses to relate any out-of-court statements [declarant] had made to them to the effect that he was scared, anxious, sad, or in any other state reflecting his then existing mental or emotional condition. And this for the purpose of proving the truth of the matter asserted in the statement-that [declarant] actually was afraid or distraught-because the preamble to F.R.E. 803 provides that such testimony "is not excluded by the hearsay rule." But the state-of-mind exception does not permit the witness to relate any of the declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind. If the reservation in the text of the rule is to have any effect, it must be understood to narrowly limit those admissible statements to declarations of condition-"I'm scared"-and not belief-"I'm scared because Galkin threatened me."

*United States v. Cohen*, 631 F.2d 1223, 1225 (5th Cir. 1980).

Here, the Court agrees with the Government that Defendant is attempting to prove the underlying event rather than the witness's state of mind.  Consequently, this exception does not apply.

### e.  Forfeiture by Wrongdoing

If a witness is unavailable, the rules of evidence except from the hearsay rule a "[a] statement offered against a party that wrongfully caused--or acquiesced in wrongfully causing-- the declarant's unavailability as a witness, and did so intending that result." Fed. R. Evid. 804(b)(6). "The party invoking the rule carries the burden of showing by a preponderance of the evidence that the opposing party wrongfully and intentionally made the witness unavailable." *United States v. Hankton*, 51 F.4th 578, 598–99 (5th Cir. 2022).

16

Here, the Court again agrees with the Government.  "There is not a shred of evidence that [Kemp] did anything to keep the witness from testifying." (Doc. 144 at 11.)  Consequently, Defendant cannot invoke this exception.

<em>f.</em>  <u>Residual Exception</u>

The question of whether the residual exception applies is a closer call.  But, ultimately, the Court finds that Defendant has not met his burden.

The Fifth Circuit recognizes that the residual hearsay exception contained in Rule 807 "is to be used only rarely, in truly exceptional cases." *See e.g., United States v. Walker*, 410 F.3d 754 (5th Cir. 2005); *see also Dartez v. Fibreboard Corp.*, 765 F.2d 456, 461 (5th Cir. 1985) (stating that residual hearsay exception should be used "sparingly").

Rule 807 provides in relevant part:

> (a) In General. Under the following conditions, a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804:
>
> (1) the statement is supported by sufficient guarantees of trustworthiness--after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and
>
> (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid. 807(a).

Thus, "the court should proceed directly to a determination of whether the hearsay is supported by guarantees of trustworthiness." Fed. R. Evid. 807, advisory committee comments to 2019 Amendments.  "[T]he existence or absence of corroboration is relevant to, but not dispositive of, whether a statement should be admissible under this exception. Of course, the court must

consider not only the existence of corroborating evidence but also the strength and quality of that evidence." *Id.* Further:

> a court assessing guarantees of trustworthiness may consider whether the statement is a "near-miss" of one of the Rule 803 or 804 exceptions. If the court employs a "near-miss" analysis it should--in addition to evaluating all relevant guarantees of trustworthiness--take into account the reasons that the hearsay misses the admissibility requirements of the standard exception.

*Id.*

Additionally, "[i]n deciding whether the statement is supported by sufficient guarantees of trustworthiness, the court should not consider the credibility of any witness who relates the declarant's hearsay statement in court," as that would "usurp the jury's role of determining the credibility of testifying witnesses." *Id.* "The rule provides that the focus for trustworthiness is on circumstantial guarantees surrounding the making of the statement itself, as well as any independent evidence corroborating the statement." *Id.*

Ultimately, "in order to find a statement trustworthy, a court must find that the declarant of the statement was particularly likely to be telling the truth when the statement was made." *United States v. Phillips*, 219 F.3d 404, 419 n.23 (5th Cir. 2000) (cleaned up). "Given this high hurdle, in the decision as to whether to apply the residual exception district courts are given considerable discretion. . . ." *Id.* (cleaned up).

Having carefully considered the matter, the Court finds that statements concerning the loud boom will be inadmissible. In sum, there are several layers of hearsay, and Defendant fails to provide an exception for each one.

More specifically, the Government has provided Roberts's notes, and those notes state that a "witness reported that he was out smoking, when he heard a boom and heard tires squeal." (Doc.

151-2 at 4.)  Kemp "left his business card at that house, seeking to speak with this witness, but

[had] not been able to do so." (*Id.* at 4.)[1]  Likewise, Kemp stated in his declaration;

> On January 9, 2019, SACFI O'Brien and I canvassed the neighborhood and formally interviewed several residents of Beech Street near Sam's Men's Fashions. I included summaries of the interviews in one of my reports. There is no indication in my report of any witness mentioning tires squealing.
>
> [ ] I remember that there was one potential witness that I was unable to interview. I believe that Sylvia Ann Betts of [XXXX] Beech Street[2] told me that a man had stayed at her house the night before the fire and heard a noise around the time of the fire. I can't remember the relationship between Ms. Betts and the man. He may have been represented to be her daughter's or granddaughter's boyfriend. I do remember that she did not have much information on him and that he did not live in Baton Rouge. Despite several attempts, including leaving my business card at the home and reaching out to Ms. Betts (and possibly trying to Google the man's name), I was never able to get in touch with the potential witness. I don't know whether I had a name and contact information for him or not. If I did, I have looked and no longer have it. I remember that, at some point, I began to have doubts about whether the man even existed.
>
> [ ] I have no explanation for why Roberts's notes indicate that I relayed a report that a witness heard squealing tires. It is possible that I received such a report from someone and relayed it to Roberts, though I don't remember it now. It is also possible that Roberts misunderstood something I said.

---

[1] The full statement from Roberts' notes reads:

> Next, I met with Mr. Levert Kemp with the Baton Rouge Fire Department. He advised that the fire department received the call at 5:27am. He explained that neighbors said that they heard a loud boom, and one of the neighbors came and saw fire venting from the roof. This witness reported that he was out smoking, when he heard a boom and heard tires squeal. Mr. Kemp noted that this neighbor actually did not live at the house; he was just visiting. Mr. Kemp also mentioned that he left his business card at that house, seeking to speak with this witness, but has not been able to speak with him.

(Doc. 151-2 at 4.)

[2] Ms. Betts' address number has been redacted in this ruling, though it is provided in the declaration.

(Doc. 151-1 ¶¶ 6–8.)  Thus, here, the statement was purportedly made by a witness, to a neighbor (Betts), to Kemp, to Roberts, and then to Roberts' notes.

Going backwards, statements by Roberts to the notes and from Kemp to Roberts come with a high degree of trustworthiness, and the documentation in Robert's notes provides corroborating circumstances.  Thus, these statements likely satisfy Rule 807.

However, statements made from the neighbor to Kemp are more tenuous.  The Government has indicated that Kemp does not remember the statement, (Doc. 144 at 12), and Kemp's declaration confirms this, (Doc. 151-1 ¶ 4.)  Thus, the corroborating circumstances are what is documented in Roberts' notes, which is hearsay within hearsay. (Doc. 144 at 12.)  Given Kemp's representations in his declaration (that the witness never contacted him, despite his leaving his card at the residence, and that Kemp could not locate the witness through other means), the Court doubts that the "declarant of the statement was particularly likely to be telling the truth when the statement was made." *Phillips*, 219 F.3d at 419 n.23 (cleaned up).  At the very least, application of this exception for this statement would be a close call, and given Rule 802's "high hurdle," *id.*, and the fact that the rule should be "used only rarely, in truly exceptional cases," *Walker*, 410 F.3d at 757, the scales would likely weigh against admission.

But, even assuming Defendant could get past this layer of hearsay, Defendant clearly fails on the final one: statements made by the witness to the neighbor.  Defendant has provided virtually no details about the circumstances surrounding these statements.  Further, as the Government noted, there are no corroborating circumstances for this statement beyond Kemp's declaration, as Defendant has pointed to no other evidence demonstrating that other people heard the squealing tires.  Finally, as demonstrated above, there is no "near-miss" from the other hearsay exceptions, for they do not present a close call.

In sum, under the totality of the circumstances, there are insufficient guarantees of trustworthiness to warrant admission of the statement by the witness to the neighbor (and, in all likelihood, from the neighbor to Kemp). Consequently, Defendant cannot establish an exception for each level of hearsay, and this statement must be excluded.

g.   Alleged *Brady* Violation

"The prosecution has a duty to disclose exculpatory evidence that is material to either guilt or punishment." *Bower v. Quarterman*, 497 F.3d 459, 476 (5th Cir. 2007) (citing *Brady v. Maryland,* 373 U.S. 83 (1963)). "Materiality requires 'an exculpatory value that was apparent before the evidence was destroyed' and that was 'of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' " *Id.* (quoting *Cali. v. Trombetta,* 467 U.S. 479, 489 (1984)). Further, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *United States v. Bagley,* 473 U.S. 667, 682 (1985)). "Absent a showing of bad faith, failure to preserve potentially useful evidence does not constitute a denial of due process." *Id.* (citing *Ariz. v. Youngblood,* 488 U.S. 51, 57–58 (1988)). "In sum, impermissibly withheld evidence must be either (1) material and exculpatory or (2) only potentially useful, in combination with a showing of bad faith on the part of the government." *Id.* (citing *Ill. v. Fisher,* 540 U.S. 544 (2004)).

Here, the Court finds no *Brady* violation. At the outset, Defendant concedes that there was no bad faith. (Doc. 146 at 5 ("the defense is in no position to say Captain Kemp acted in bad faith."). Further, the Court has reviewed Kemp's declaration, (Doc. 151-1), and there is no indication that he in any way acted in bad faith or for the purpose of suppressing the evidence.

Moreover, Defendant has made no showing of any motive or any other reason for Kemp to do so.

Thus, if Defendant seeks to use this information, he must demonstrate it is material.

Defendant has failed to do so. Again,

> [T]he test of materiality under *Brady* is: The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. . . .[U]ndisclosed evidence is material if there is a "reasonable probability" that the result of the trial would have been different, not just a reasonable possibility.

 2 Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 256 (4th ed. 2022).

As the Government states:

> [The statement] is nothing more than a lead that didn't pan out. The statement itself is not admissible, and there is no proof that it could lead to admissible evidence. It is therefore unclear how it could affect the outcome of the proceedings. To the extent that it could somehow affect the preparation of the defense, the substance of the information has been disclosed, and defendant can craft his defense using the information.

(Doc. 144 at 15.)  The Court agrees with each of these points.

Additionally, even if the evidence was material, "[i]f material is exculpatory and subject to disclosure, but is not discoverable under Rule 16, then *Brady* only requires that it be disclosed in time to allow the defendant to use it effectively at trial." Wright & Miller, § 256.  Here, the Government disclosed on Wednesday, January 18, 2023, Kemp's declaration, which details the circumstances of Kemp's interview with Ms. Betts. (Doc. 151-1.) This is adequate time for Defendant to effectively prepare for trial, though, if Defendant would like a continuance, the Court will entertain such a motion.  For now, however, Defendant's motion on this issue is denied.

*h.*   Need for a Hearing

No hearing is required on these issues.  "[A] defendant's motion alleges sufficient facts to warrant an evidentiary hearing when it is "sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented." *United States v. Smith-Bowman*, 76 F.3d 634, 637 (5th Cir. 1996) (quoting *United States v. Harrelson*, 705 F.2d 733, 737 (5th Cir. 1983)).  "Moreover, '[g]eneral or conclusory assertions, founded upon mere suspicion or conjecture, will not suffice.' " *Id.* (quoting *Harrelson*, 705 F.2d at 737).  This Court's decision on whether to grant a hearing is reviewed under the abuse of discretion standard. *Id.*

Here, Defendant has failed to meet his burden to justify a hearing.  As the Government argues:

> Defendant has made no effort to make a showing of bad faith that would justify a hearing. His goal in seeking a hearing is admittedly, not to prove bad faith, but to discover whether there is bad faith. That is not the purpose of a hearing.

(Doc. 151 at 2.)  The Court agrees.  Defendant's arguments are rejected, and the motion will be denied on this issue.

*i.*   Spoliation

Finally, no spoliation instruction is warranted either.  "Spoliation of evidence is the destruction or the significant and meaningful alteration of evidence." *Crain v. City of Selma*, 952 F.3d 634, 639 (5th Cir. 2020) (quoting *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015) (cleaned up)).  "Under the spoliation doctrine, a court may instruct a jury that it may draw an adverse inference that a party who intentionally destroys important evidence in bad faith did so because the contents of those documents were unfavorable to that party." *Id.* (cleaned up). Defendant must show that defendants intentionally altered or destroyed the evidence or that they did so in order to hide the adverse evidence. *See id.*

Here, again, by Defendant's own admission, Defendant has no evidence of such bad faith. (Doc. 146 at 3.)  Consequently, any spoliation instruction would be improper.

For all these reasons, the Court finds that any statements referenced in Roberts's notes about a neighbor hearing from a witness of squealing tires on the night of the incident are inadmissible hearsay.  Defendant's motion on this issue is denied.

### III.   GOVERNMENT'S MOTION – OTHER ARSON EVIDENCE (DOC. 143)

#### A. Parties' Arguments

##### *1. Government's Memorandum in Support (Doc. 143-1)*

The Government seeks an order excluding evidence of other arsons committed in Baton Rouge. (Doc. 143.) Specifically, Defendant has indicated to the Government that it will introduce at trial (1) a list from the Baton Rouge Fire Department of all fires in the year before and after the Sam's fire, and (2) a map which plots all arsons within four miles of Sam's in the sixty-day periods before and after the fire. (Doc. 143-1 at 1.)  According to the Government, Defendant seeks to use this evidence to show (1) that the prosecution's origin and cause expert, ATF Special Agent Certified Fire Investigator (SACFI) Devin O'Brien could be cross-examined regarding his failure to consider the other fires, and (2) that someone other than Defendant committed the arson. (*Id.* at 1–2.)

On the first issue, the Government asserts that Defendant's argument is rooted in a misunderstanding of the NFPA 921 manual, which is the industry standard reference guide for conducting fire investigations and which both experts use. (*Id.* at 2.)  The Government maintains:

> The NFPA 921 is quite clear that the analysis of other fires is to be conducted only after a determination that a fire was incendiary. The purpose of the analysis is to identify the arsonist, not to determine origin and cause. In this case, SACFI O'Brien will be testifying only as to the origin and cause of the fire, not as to the identification of the arsonist. As a result, the NFPA 921 manual does not provide that

he should consider "other evidentiary factors" like arson trends or patterns. As such, his failure to conduct an analysis of other incendiary fires in Baton Rouge is irrelevant.

(*Id.* at 2–3.)  Further, even if such cross examination were proper, "the map and list of arsons would not be relevant," as such documents do not reflect "any trends or patterns of repetitive fire-setting behavior." (*Id.* at 3.)  Defendant wants to establish that O'Brien failed to look for trends and patterns of fires by asking if he conducted the analysis. (*Id.*)

> But defendant wants to go one step further by trying to demonstrate what SACFI O'Brien supposedly missed. To do that, he proposes introducing the universe of other fires in the area within certain time periods.  But that universe is *where* he thinks SACFI O'Brien should have looked, not *what* SACFI O'Brien might have found. The map shows every arson in a fifty-square-mile area over a four month period, and the list documents every arson in Baton Rouge during a two-year period. . . . Without a trend or pattern suggesting serial arson, the map and list are meaningless. Metaphorically speaking, defendant seeks to fault SACFI O'Brien for missing evidence hidden under a rock and, as proof of that deficiency, offers the rock instead of what's under it. If there's nothing under the rock, the expert's opinion is not undermined. The map and list simply do not demonstrate that any evidence of trends or patterns of repetitive firesetting was overlooked.

(*Id.*)

On the second issue—using the information and map to show that someone else committed the fire—the Government argues that such evidence is improper "reverse 404(b)" evidence. (*Id.* at 4.)  To use such evidence, Defendant must show that the other arsons are similar to the arson with which he is charged. (*Id.*)  Here, Defendant offers no proof of similarity. (*Id.* at 5.)  The map shows only that there are many arsons in Baton Rouge, but, without some evidence of similarity, the map is not relevant. (*Id.*)  Further, to use "reverse 404(b)" evidence, Defendant must offer evidence that he did not commit the other arsons, and, here, he has not done so. (*Id.* at 5–6.)

### *2. Defendant's Memorandum in Opposition (Doc. 145)*

Defendant responds:

> There is no question that the fire in this case was the product of arson. The jury's decision in this case is to determine whether the Government can prove beyond a reasonable doubt that Sam Dabit committed the arson. It is submitted to the Court that the ATF investigators failed to abide by the industry standards set forth in NFPA 921.

(Doc. 145 at 1.)

Defendant maintains that it is not seeking to submit evidence of all arsons but rather only those occurring 60 days before and after and within a four-mile radius. (*Id.* at 2.)  Defendant then asserts that looking at other fires is entirely proper under the NFPA 921 because "[w]e are not looking at motive to determine what caused the fire. We should look at motive (as the Government has done to Mr. Dabit) in identifying potential suspects. This should be done after the fire origin has been determined. Again, the Government failed to do it." (*Id.* at 2–3.)  Agent O'Brien engaged in a number of good techniques to determine what caused the fire, but he failed to use the above ones. (*Id.* at 3.)  Further, contrary to the Government's representations, O'Brien did testify to the Grand Jury that Dabit was the one responsible. (*Id.* at 4.)

Defendant continues: "The Government claims that his failure to conduct an analysis of other incendiary fires in Baton Rouge is irrelevant. Nothing could be further from the truth. Why is it okay for him to pursue every lead possible on Mr. Dabit and yet take no action on any other suspects?" (*Id.*)

Defendant also disputes that the map shows no trend or pattern; rather, it shows a temporal and geographic pattern:

> These are the trends or patterns that 921 tells a good investigator to look for. And yes, the defense wants to ask Agent O'Brien where he should have looked – a very limited area and time span. We are not

> asking Agent O'Brien what he should have looked for; he knows that. He knows, had he looked, he would have found that there were other arsons close in time and proximity and he could have developed other suspects.

(*Id.*)

Defendant closes by comparing this case to the Derek Todd Lee murders. (*Id.*)  Defendant says that homicide detectives had to look at other murders in that case, and, likewise, investigators should have looked at other arsons in this one. (*Id.*)

### B.  Law and Analysis

Having carefully considered the matter, the Court will grant the Government's motion in part and deny it in part.  As to the first issue, the Government maintains that O'Brien complied with NFPA 921 because he will only testify as to the fact of arson and not who did it. (Doc. 135-1 at 1–2.)  Defendant, on the other hand, contends that O'Brien violated the manual, specifically Chapters 24.4.2; 24.4.9.1; and 24.2.9.3.1.2, and that O'Brien did in fact opine before the Grand Jury as to the perpetrator of the arson. (Doc. 145 at 2–4.)

The Court finds that this issue is best resolved by the jury and that, consequently, Defendant will be able to cross-examine O'Brien about the agent's alleged failure to consider other fires, against the industry standard practices set forth in NFPA 921. Cross-examination about such failures is fairly within the scope of the Government's proposed direct examination (i.e., that the fire was started by arson), even if O'Brien does not testify as to who committed the arson (as he did before the Grand Jury)  Ultimately, if O'Brien believes he did in fact adhere to the manual, he can explain that on cross.

However, the Court agrees with the Government that the list of other fires and map is not properly the subject of cross examination.  The Court finds the Government's analogy to the rock to be highly persuasive.  Again:

> Without a trend or pattern suggesting serial arson, the map and list are meaningless. Metaphorically speaking, defendant seeks to fault SACFI O'Brien for missing evidence hidden under a rock and, as proof of that deficiency, offers the rock instead of what's under it. If there's nothing under the rock, the expert's opinion is not undermined. The map and list simply do not demonstrate that any evidence of trends or patterns of repetitive firesetting was overlooked.

(Doc. 143-1 at 3.)

Here, there is simply no pattern with respect to the fires. The Court is unconvinced by Defendant's assertion of a temporal or geographic trend, as the map simply shows that there are a lot of suspected arsons in Baton Rouge, without any evidence whatsoever of the nature or characteristic of those crimes. Even if such evidence were probative, that relatively slight probative value would be substantially outweighed by the danger of unfair prejudice and confusion.

In sum, while Defendant can cross-examine O'Brien about the agent's failure to adhere to the NFPA 921, Defendant cannot offer evidence of the other fires or the map to prove what arsons did in fact happen around Sam's.

Likewise, Defendant cannot use this evidence to show that someone else committed the fire, as this would be improper "reverse 404(b)" evidence. "[A] defendant on trial for the commission of a crime, in order to negative his guilt, may show that other crimes of a similar nature have been committed at or about the same time by some person other than himself." *Holt v. United States*, 342 F.2d 163, 165–66 (5th Cir. 1965). "In contrast to ordinary 'other crimes' evidence, which is used to incriminate criminal defendants, 'reverse 404(b)' evidence is utilized to exonerate defendants." *United States v. Stevens*, 935 F.2d 1380, 1402 (3d Cir. 1991).

"Several approaches have emerged, ranging from a rule . . . freely admitting any proof that is relevant in suggesting third-party guilt to a more rigorous standard that Rule 404(b) sets for

prosecutors." 1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 4:37 (4th ed. 2022). "Due to these difficulties [with "reverse 404(b)" evidence,] the wiser rule is a compromise between the extremes, in the form of a more lenient pragmatic relevancy standard, which is already embodied in Rule 401 to 403, for admitting defense evidence of third-party acts and crimes—a standard that is less demanding than the one that applies to the prosecutor's proof of the defendant's other acts and crimes." *Id. See also Stevens*, 935 F.2d at 1405 ("a defendant may introduce reverse 404(b)' evidence so long as its probative value under Rule 401 is not substantially outweighed by Rule 403 considerations."); *United States v. Murray*, 474 F.3d 938, 939 (7th Cir. 2007) ("A jury is unlikely to acquit a defendant even if it thinks there's someone else out there who has a propensity to commit such crimes, so that in such a case Rule 403's balancing test . . . is all one needs to keep 'other crimes' evidence within bounds." (citing, *inter alia*, *Stevens*); 3 Michael H. Graham, *Handbook of Fed. Evid.* § 404:5 (9th ed. 2022) ("A majority of federal circuits take the approach followed by [*Stevens*]" that Rule 404(b) does not apply to crimes committed by someone other than the defendant (quoting *State v. Gillispie*, 985 N.E.2d 145, 151 (Ohio App. 2 Dist. 2012)).

Thus, the similarity between the instant offense and the other offenses is a factor to weigh in the "reverse 404(b)" analysis. *See United States v. Cox*, 54 F.4th 502, 514 (7th Cir. 2022) ("[U]nless the other crime and the present crime are sufficiently alike to make it likely that the same person committed both crimes, so that if the defendant did not commit the other crime he probably did not commit this one, the evidence will flunk Rule 403's test." (quoting *Murray*, 474 F.3d at 939). Some cases require a high degree of similarity. *See id.* at 515 ("Reverse 404(b) evidence requires 'something distinctive about all the crimes that makes them form a pattern, rather than their having merely a chance resemblance.' " (quoting *Murray*, 474 F.3d at 941)). While "[t]here is authority supporting the argument that a lower standard should be utilized when

evaluating the admissibility of other acts evidence when offered by the defendant," even with this lower standard, "a showing of similarity must still be made by the defendant. In each of the cases supporting a lower standard for other acts evidence offered by the defendant, a degree of similarity must still be shown." Graham, *Handbook of Fed. Evid.* § 404:5 (quoting *State v. Jolley*, 2003 SD 5, 656 N.W.2d 305, 308 n.2 (S.D. 2003)). *See also id.* (collecting cases on degree of similarity required); *Stevens*, 935 F.2d at 1401, 1405 (finding reversable error in failure to allow "reverse 404(b)" evidence because the similarities between the two crimes were "significant" in that "[b]oth crimes: (1) took place within a few hundred yards of one another; (2) were armed robberies; (3) involved a handgun; (4) occurred between 9:30 p.m. and 10:30 p.m.; (5) were perpetrated on military personnel; [ ] (6) involved a black assailant who was described similarly by his victims"; (7) according to the investigating officer, the "subject, in both files, had a gun, stole wallets and rummaged through the victims pockets and were in the same areas on post"; and (8) the perpetrator stole the victim's military ID card).

Here, again, Defendant presents almost no evidence of the similarity of the instant arson with the other arsons occurring near Sam's. Defendant presents nothing more than their times and locations, without any underlying evidence of the circumstances of these crimes. The Court finds that, even under the more lenient 401/403 standard described above, without some evidence of some similarity, any probative value from Defendant's evidence (which is minimal) would be substantially outweighed by the danger of unfair prejudice or jury confusion.

Consequently, evidence of the map and other arsons will not be admitted for the purpose of showing that someone else committed the crime. The Government's motion on this issue will be granted.

IV.   CONCLUSION

Accordingly,

**IT IS ORDERED** that the *Defendant's Motion for Pretrial Ruling on the Admissibility of Evidence* (Doc. 136) is **DENIED** with respect to the statements at issue reflected in Roberts' notes and **DENIED AS MOOT** as to Anthony's statement.

**IT IS FURTHER ORDERED** that the Government's *Motion in Limine to Exclude Evidence of Other Arsons* (Doc. 143) is **GRANTED IN PART** and **DENIED IN PART**. In sum, Defendant can cross-examine O'Brien about the agent's failure to adhere to the NFPA 921, but Defendant cannot offer evidence of the other fires or the map to prove what arsons did in fact happen around Sam's.  Further, Defendant cannot use evidence of other fires or the maps as "reverse 404(b)" evidence to prove someone other than Defendant committed the arson.

Signed in Baton Rouge, Louisiana, on <u>January 20, 2023</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**