## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

VERSUS

SALEEM YOUSEF DABIT, a/k/a "Sam Dabit"

CRIMINAL ACTION

NO. 19-143-JWD-RLB

## RULING AND ORDER

This matter comes before the Court on the *Motion for Post Verdict Judgment of Acquittal Pursuant to Federal Rule of Criminal Procedure Rule 29* (Doc. 179) filed by Defendant Saleem Yousef Dabit, a/k/a "Sam Dabit" ("Defendant" or "Dabit"). The United States of America ("Government" or "United States") opposes the motion. (Doc. 184.) Defendant filed a reply, (Doc. 185), and the Government filed a sur-reply, (Doc. 188). Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, the motion is denied.

### I.    RELEVANT BACKGROUND

This case involves a fire that took place on January 1, 2019, at Sam's Men's Fashions ("Sam's"), a clothing store owned by Dabit. (*See Am. Indictment*, Doc. 64 at 1–3.) Defendant also lived in a residence next to Sam's. (*Id.* at 1.) After the fire, Defendant made a claim with his insurer, Hanover Insurance Group ("Hanover"). (*Id.* at 1–4.)

On November 7, 2019, Defendant was charged in a three-count Indictment related to the fire, (Doc. 1), which was later amended on August 10, 2021, (Doc. 64). In sum, the Defendant stood accused of starting the fire and then perpetrating wire fraud against Hanover by making several false statements to obtain insurance proceeds from the loss. (*See id.* at 2–6.)

More specifically, Count One of the Amended Indictment alleged that Defendant knowingly used a fire to commit a felony, namely, wire fraud, in violation of 18 U.S.C. § 844(h)(1). (*Id.* at 3.) Count Two charged Defendant with using fire to maliciously damage property in violation of 18 U.S.C. § 844(i). (*Id.*)

Count Three alleged that Defendant committed wire fraud in violation of 18 U.S.C. § 1343. (*Id.* at 3–6.) Specifically, Defendant purportedly devised a scheme to defraud and obtain money from Hanover through false representations and, to execute the scheme, knowingly made a wire communication. (*Id.* at 4.) As to the manner and means, the Indictment said that Dabit sought to accomplish this scheme by:

> (a) setting fire to Sam's, with gasoline from at least 15 containers, which caused a massive fuel-air explosion;
>
> (b) "almost immediately . . . ma[king] a formal claim under materially false and fraudulent pretenses to Hanover to have his insurance cover the loss from the fire, and for weeks thereafter, ma[king] materially false and fraudulent representations to fire scene and financial investigators about the cause of the fire and his business finances that would support payment of the claim;"
>
> (c) "plac[ing] a telephone call . . . on January 2, 2019, . . . to Hanover to make a claim for the fire loss" and "falsely . . . [telling] the claims agent that an electrical problem had probably caused the fire" when, "in fact, as [he] knew, he had intentionally set the fire himself;" and
>
> (d) "continu[ing] to violate the express terms of his insurance policy and [making] a number of false . . . statements to investigators about the circumstances of the fire . . ."

(*Id.* at 4–5.) Examples of this last category of manner and means include:

> (i) on or about January 2, 2019, telling Baton Rouge Fire Department ("BRFD") and Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") "that he was awakened on the morning of the fire when firefighters entered his adjoining residence to rescue him;"

(ii) around January 30, 2019, falsely telling BRFD and ATF investigators that intruders "must have broken into the business with the gasoline containers and set the fire;"

(iii) on approximately January 31, 2019, falsely telling Hanover, BRFD, and ATF investigators that intruders broke into the business through a loose metal panel on the roof with the gasoline containers to set the fire;

(iv) on or about February 8, 2019, falsely telling investigators that a former handyman and his friends must have broken into his business through the loose roof panel to set the fire, and exited through the same roof;

(v) around February 8, 2019, falsely telling investigators that he was awakened on the morning of the fire when the firefighters entered his adjoining residence to rescue him, and that he had not heard the explosion or anything else prior to the firefighters arriving.

(*Id.* at 4–6.) The alleged wiring occurred on January 2, 2019, when Dabit made the call to the Hanover claims center to report the fire at Sam's and to make a claim under his insurance policies. (*Id.* at 6.)

The jury trial began on January 23, 2023. (Doc. 156.) After the close of evidence, on January 27, 2023, the jury was instructed that, to convict the Defendant of wire fraud, the jury had to find that the Government proved each of the following elements beyond a reasonable doubt:

First: That the defendant knowingly devised or intended to devise any scheme to defraud, that is, a scheme to obtain money from his insurance carrier, the Hanover Insurance Group;

Second: That the scheme to defraud employed false material pretenses, promises, or representations;

Third: That the defendant transmitted or caused to be transmitted by way of wire communications, in interstate commerce, any writing, signal, or sound for the purpose of executing such scheme; and

Fourth: That the defendant acted with a specific intent to defraud.

(U.S. Attach. B, Doc. 184-2 at 1–2.) The Court also provided more detailed instructions about this burden:

> It is not necessary that the government prove all of the details alleged in the indictment concerning the precise nature and purpose of the scheme. What must be proved beyond a reasonable doubt is that the defendant knowingly devised or intended to devise a scheme to defraud by means of false or fraudulent pretenses, promises or representations that was substantially the same as the one alleged in the indictment.
>
> It is also not necessary that the government prove that the material transmitted by wire communications was itself false or fraudulent, or that the use of the interstate wire communications facilities was intended as the specific or exclusive means of accomplishing the alleged fraud.
>
> What must be proved beyond a reasonable doubt is that the use of the interstate wire communications facilities was closely related to the scheme because the defendant either wired something or caused it to be wired in interstate commerce in an attempt to execute or carry out the scheme.

(*Id.* at 3.) These instructions were taken from the Fifth Circuit Pattern Jury Instructions (Criminal), No. 2.57 (2019), and were jointly requested by the parties. (*See* Doc. 50 at 3–4; Doc. 141 at 1 (minutes from pretrial conference during which defendant withdrew objection to these instructions).)

The jury returned their verdict on January 27, 2023. (Doc. 161.) The jury found Defendant not guilty of Counts One and Two (using a fire to commit a felony and to maliciously damage property, respectively) and guilty of Count Three (wire fraud). (Doc. 163.)

Defendant now files this post-verdict motion under Federal Rule of Criminal Procedure 29. (Doc. 179.) Defendant's motion essentially rests on two grounds. (*See* Docs. 179-1, 185.) First, Defendant contends that the verdict is not merely inconsistent but impermissibly irreconcilable.

(Doc. 179-1 at 12–13; Doc. 185 at 3.) Second, Dabit maintains that there is insufficient evidence to support the verdict on the wire fraud count. (Doc. 179-1 at 13; Doc. 185 at 1–3.)

## II.    RELEVANT STANDARD

After a guilty verdict, a defendant may move for a judgment of acquittal on the grounds that the evidence is insufficient to sustain a conviction. Fed. R. Crim. P. 29(a), (c)(1).

The Court's "review, though, is 'highly deferential to the verdict. The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Emordi*, 959 F.3d 644, 650 (5th Cir. 2020) (quoting *United States v. Kuhrt*, 788 F.3d 403, 413 (5th Cir. 2015) (citation omitted)). *See also United States v. Waguespack*, 935 F.3d 322, 330 (5th Cir. 2019) (stating that the court "must affirm the verdict unless no rational juror could have found guilt beyond a reasonable doubt." (quoting *United States v. Hoffman*, 901 F.3d 523, 541 (5th Cir. 2018) (quotation omitted))).

But, "a verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference." *Id.* (quoting *United States v. Moreland*, 665 F.3d 137, 149 (5th Cir. 2011) (quotation omitted)). The Court cannot "credit inferences within the realm of possibility when those inferences are unreasonable." *Id.* (quoting *Moreland*, 665 F.3d at 149 (quotation omitted)). "Accordingly, [the Court] will overturn a guilty verdict 'where the government has done nothing more than pile inference upon inference to prove guilt.'" *Id.* (quoting *Moreland*, 665 F.3d at 149 (quotation omitted)).

Nevertheless, the Court "give[s] the party that convinced the jury the benefit of all reasonable inferences." *Waguespack*, 935 F.3d at 330 (quoting *United States v. Lucio*, 428 F.3d 519, 522 (5th Cir. 2005)); *see also United States v. DeJean*, 613 F.2d 1356, 1358 (5th Cir. 1980)

("All reasonable inferences and credibility choices must be made in support of the jury verdict." (citing *United States v. Wieschenberg*, 604 F.2d 326 (5th Cir. 1979))). "In effect, the court assumes the truth of the evidence offered by the prosecution." *United States v. Robertson*, 110 F.3d 1113, 1117 (5th Cir. 1997). The Court "ask[s] only if the verdict was reasonable, not whether it was correct." *Emordi*, 959 F.3d at 650 (citing *Kuhrt*, 788 F.3d at 413).

## III.  DISCUSSION

### A.  Inconsistent or Irreconcilable Verdict?

Defendant asserts: "Inconsistent verdicts can co-exist. Irreconcilable ones cannot." (Doc. 185 at 3.) Defendant says that, since the jury found Dabit not guilty on Counts One and Two, they necessarily found that Dabit did not start the fire; thus, Defendant could not have committed wire fraud when "the Count . . . as alleged in the indictment is *dependent upon* Sam Dabit knowing that arson was the cause of the fire." (*Id.*)

The Government counters that consistency in the verdict is not necessary. (Doc. 184 at 4.) The United States explains that this rule is well established by the United States Supreme Court and Fifth Circuit. (*Id.* at 4–5.) Indeed, according to the Government, an acquittal does not mean the jury found the Defendant innocent, and a not guilty verdict does not establish any facts favorable to the Defendant. (*Id.* at 5–7.) The United States urges that Defendant ignores the authority it cited and fails to cite any to support the distinction between "inconsistent" and "irreconcilable" verdicts. (Doc. 188 at 6–7.)

In short, the Court agrees with the Government. "[W]here truly inconsistent verdicts have been reached, [t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were

not convinced of the defendant's guilt." *United States v. Powell*, 469 U.S. 57, 64–65 (1984) (quoting *Dunn v. United States*, 284 U.S. 390, 393 (1932)).

> The rule that the defendant may not upset such a verdict embodies a prudent acknowledgment of a number of factors. First, as the above quote suggests, inconsistent verdicts—even verdicts that acquit on a predicate offense while convicting on the compound offense—should not necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense.

*Id.* at 65. *See also United States v. Price*, 750 F.2d 363, 365 (5th Cir. 1985) ("It has long been recognized that criminal juries in the United States are free to render 'not guilty' verdicts resulting from compromise, confusion, mistake, leniency or other legally and logically irrelevant factors." (citing *Dunn*, 284 U.S. at 393–94)).

Moreover, the High Court has rejected as "imprudent and unworkable[] a rule that would allow criminal defendants to challenge inconsistent verdicts on the grounds that the verdict was not the product of lenity, but of some error that worked against them." *Powell*, 469 U.S. at 66. "Such an individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake." *Id.*

"Finally, . . . a criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts." *Id.* at 67. "Sufficiency-of-the evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt. This review should be independent of the jury's determination that evidence on another count was insufficient." *Id.* (internal citations omitted).

The *Powell* court specifically rejected an exception to this rule in cases "where the jury acquits a defendant of a predicate felony, but convicts on the compound felony." *Id.* One such reason is that it is simply wrong to assume that the jury erred in the Defendant's favor:

> Whether presented as an insufficient evidence argument, or as an argument that the acquittal on the predicate offense should collaterally estop the Government on the compound offense, the argument necessarily assumes that the acquittal on the predicate offense was proper—the one the jury "really meant." This, of course, is not necessarily correct; all we know is that the verdicts are inconsistent. The Government could just as easily—and erroneously—argue that since the jury convicted on the compound offense the evidence on the predicate offense must have been sufficient. The problem is that the same jury reached inconsistent results; once that is established principles of collateral estoppel— which are predicated on the assumption that the jury acted rationally and found certain facts in reaching its verdict—are no longer useful. . . .
>
> Given this impasse, the factors detailed above—the Government's inability to invoke review, the general reluctance to inquire into the workings of the jury, and the possible exercise of lenity—suggest that the best course to take is simply to insulate jury verdicts from review on this ground.

*Id.* at 68–69.

Thus, for example, in *Powell*, the jury acquitted defendant of conspiracy to possess cocaine and possession of cocaine, yet they still found defendant guilty of using the telephone to facilitate those crimes. *Id.* at 69. The Supreme Court concluded, "For the reasons previously stated, however, there is no reason to vacate respondent's conviction merely because the verdicts cannot rationally be reconciled." *Id.*

In sum, "an acquittal is not necessarily to be taken as the equivalent of a factual finding of innocence; nor does it necessarily reflect a failure of proof on the part of the prosecution." *Price*, 750 F.2d at 365 (citing *United States v. Espinosa-Cerpa*, 630 F.2d 328 (5th Cir. 1980)). This Court must "consider each count in a multi-count verdict separately, and a guilty verdict upon any count

8

may stand, notwithstanding its inconsistency, provided it is supported by substantial evidence." *Id.* (citing *United States v. Varkonyi,* 611 F.2d 84 (5th Cir. 1980)).

Based on these authorities, Defendant's argument easily fails. Indeed, *Powell* makes no meaningful distinction between inconsistent and irreconcilable. In fact, its conclusion shows there is none. Given *Powell* and *Price* (both of which are nearly forty years old), this Court remains bound to reject Defendant's position and deny Defendant's motion for acquittal based on any alleged irreconcilable verdict.

### B. Substantial Evidence to Support the Verdict?

#### 1. *Parties' Arguments*[1]

##### a. Defendant's Original Brief (Doc. 179-1)

The heart of Defendant's argument is that the Government alleged Defendant committed "wire fraud because he lied when he said the fire was probably electrical. Yet, at the time that he made that statement and thereafter for probably 30 days, most everyone thought it was probably electrical." (Doc. 179-1 at 13.) Defendant maintains this is supported by: (1) the jury's alleged finding in Counts 1 and 2 that Dabit did not start the fire, (*id.* at 5); (2) SA O'Brien's testimony that, when they started talking to Dabit, they were trying to figure out the cause of the fire, (*id.* at 5–6); (3) the fact that Dabit did not explore the fire scene and thus would not have known of the gas cans, (*id.* at 6); (4) the fact that Hanover's expert, Bo Roberts, made handwritten notes on January 8 that it was possibly an electrical fire, (*id.* at 7); (5) BRFD Captain Sullivan's testimony that, during the initial response to the fire, another crew was investigating whether a transformer had exploded, (*id.* at 8); (6) the fact that BRFD Captain Kemp "mentioned [on January 1, 2019] that [an electrical fire] was one of the things that had to be ruled out in that phase of the

---

[1] The Court has omitted all citations to exhibit numbers throughout this section for the sake of simplicity.

investigation," (*id.*); (7) the fact that Jerome Robinson heard Captain Kemp tell Dabit that it appeared to be an electrical fire, (*id.* at 9); and (8) the fact that notes in the Hanover file initially show that the fire was possibly electrical (around January 2 and 3) but that they do not show the fire to be the result of arson until February 9, 2019, (*id.* at 10). Defendant concludes that the verdict must be reversed because it is based on "suspicion, speculation, conjecture[,] [and] an overly attenuated piling of inference on inference." (*Id.* at 13.)

b.  Government's Opposition (Doc. 184)

In response, the Government attempts to sum up the Defendants position as follows:

> Although the defendant acknowledges that the Amended Indictment "spells out" various manner and means, he singles out merely one of those ten paragraphs to argue that the Government somehow "confined" itself to only one theory, manner or mean, by which the defendant carried out the wire fraud. Specifically, the defendant focuses solely on his false claim that the fire was "probably electrical" and then spends the entire remainder of his argument mischaracterizing trial testimony in an attempt to undermine the proof establishing that statement as false. He then compounds that error by inaccurately stating the essential elements of the crime, namely, by imposing a requirement that the United States prove that the defendant made "false representations which were transmitted by way of wire." In combination, the defendant asks this Court to ignore the allegations in the Amended Indictment and discount the totality of evidence presented during this five-day trial, in order to find a failure of proof as to one alleged false statement, allow that finding to be dispositive of the charge, and to base that finding solely on accreditation of the self-serving false statement itself. This, of course, the Court cannot do when all other evidence was to the contrary, and the jury "retains the sole authority" to weigh any conflicting evidence.

(Doc. 184 at 9–10.)

The Government then attacks Defendant's position. First, the United States asserts that it was not required to prove that the wire transition itself was false or fraudulent; rather, the Government only had to prove that "the interstate wire was closely related to the scheme and used

in an attempt to execute or carry out the scheme." (*Id.* at 10.) While the initial claim call was false, the Government says it did not need to prove that. (*Id.* at 10–11.)

Second, the Government contends that it proved that the initial call was false *and* that "defendant's scheme to defraud extended far beyond that call." (*Id.* at 11.) The United States then points to the following evidence to support the conclusion that Defendant committed the wire fraud:

(1) Kemp, O'Brien, and Roberts all testified consistently that they interviewed Defendant before examining the scene, so "there was no evidence of anyone, other than the defendant, stating that the fire was 'probably electrical' – at any time but certainly not on January 1 – and" Defendant was "uniquely positioned to know that his statement was false," (*id.* at 11–12);

(2) The jury was presented evidence that the Defendant's property had extensive security features, so it's reasonable to infer that he was the only one present, (*id.* at 12–13);

(3) Defendant claims that he was awakened from a "deep sleep" when BRFD entered his residence, even though the "explosion prompted a 9-1-1 call from two blocks away," (*id.* at 13);

(4) First responders determined that the problem was not a transformer but was rather was coming from defendant's building, (*id.*);

(5) BRFD had to undertake "extensive efforts to access the secure building, including (a) through the use of power tools to create points of access where none had existed before BRFD arrived," (b) "how multiple firefighters had worked to force entry on either side of the corner in very close proximity to where the defendant would later claim there had been a loose roof panel through which alleged intruders had entered his property with 15 gas cans," and (c) how BRFD ultimately "had to use a K-12 chainsaw to cut through the metal wall and then [use] a pipe pole (described as 'a long pole with a hook on the end') to grab the 'overlapping pieces of steel and start to pull it away and [] rip it off.'" (*Id.* at 14.) The Government posits,

> Surely, if that exact spot had exhibited any vulnerabilities or open access points, these trained firefighters, focused solely on the task of gaining entry into this structure, would have noticed and taken advantage of same. It is implausible to suggest that such access existed before the BRFD forcibly

created it. The jury heard this testimony and retains the sole
authority to weigh any conflicting defense evidence.

(*Id.*);

(6) Defendant also claimed not to hear when BRFD units arrived and fought the fire, which was described as a "very active scene" that was "pretty loud" with "power tools running, fire trucks coming in, . . . sirens and that sort of stuff." (*Id.*) Defendant claimed to Kemp that "he didn't know" and that "[h]e was in his bed asleep" until "the firefighters were breaching the rear door" and then "informed him that his building was on fire and he needed to get out." (*Id.* at 15);

(7) Captain Pourcieu testified that he never communicated any opinion about the cause of the fire to the defendant. (*Id.* at 15, 17.) Kemp also testified that no one told any information to Defendant about how the fire started. (*Id.* at 15, 17);

(8) Kempt testified that he went with Defendant back to his residence and "noticed a very strong smell of gasoline," which Defendant denied being able to smell. (*Id.* at 14–15.) The smell of gas was "very overwhelming" as he and Defendant remained in the residence. (*Id.*) Kemp commented to the Defendant, "you have to be able to smell that very strong smell of gasoline," and Defendant "said he couldn't smell anything" (*Id.* at 15);

(9) The first three gas cans were observed by firefighters and collected by Kemp, all of which were scattered among tables and shelving full of clothing and other contents, (*id.* at 16);

(10)    Kemp contradicted Robinson and testified that (a) Kemp never told Defendant the fire was probably electrical and (b) Robinson was not present during his conversation with Defendant in the van, (*id.* at 16 n.73); and

(11)    Kemp had a "strange encounter" with Robinson when Robinson "just showed up" as Kemp was collecting the gas cans into his BRFD unit and physically picked up one of the cans as evidence, (*id.* at 16–17).

The Government describes other false statements made by Defendant, many of which involve Defendant's theory that "intruders could have entered through the roof near 'Bathroom 1' of Warehouse 1, in the southwest area of the building (the same area where the firefighters had worked so extensively to force access in order to fight the fire)." (*Id.* at 18.) Defendant offered this theory despite the facts (1) that Roberts had examined the roof and found no place where the

arsonist could have entered, and (2) that Roberts testified his investigation never revealed any way an outsider without keys could have entered the building if the doors and gates were locked. (*Id.*)

Defendant accused Larry McGuffy of possibly starting the fire, (*id.* at 19), yet Defendant described McGuffy as his "friend" in his January 2, 2019, recorded interview, (*id.* at 19–20). Defendant only mentioned McGuffy as a suspect on February 8, 2019. (*Id.* at 20.) McGuffy testified at trial and denied leaving vulnerabilities in the roof and having anything to do with the fire. (*Id.*) Three investigators each found no evidence to support Defendant's claims. (*Id.*)

Finally, the Government points to Defendant's dire financial situation to support the fraud, all laid out by ATF forensic investigative auditor David Gautreau. (*Id.* at 20–21.) U.S. Trial Exhibit 12 summarizes Defendant's loan history and his debt of at least $1,285,108. (*Id.*) Additionally, U.S. Trial Exhibit 55 is the letter to the SBA, and there Dabit admitted that he suffered from a "[l]ack of funds to pay off the home equity loan with Capital One" and that "[t]herefore, we have no choice but to sell the house due to the lack of money to pay off the balance." (*Id.*)

After reviewing this evidence, the Government concludes:

> There was ample evidence upon which the jury could reasonably infer that the defendant was the only person with the access, opportunity and motive to burn down the warehouse portion of his business and to continue to make false and fraudulent statements throughout the subsequent investigation, in order to rake in hundreds of thousands of dollars in insurance proceeds to which he was not entitled.

(*Id.* at 22.) The Defendant's real complaint, says the Government, is that the verdict cannot stand on circumstantial evidence alone, but, as the jury was instructed, the "law makes no distinction between direct and circumstantial evidence." (*Id.*) The "inferences" Defendants cites are in reality "evidentiary facts at trial"—namely:

> that the defendant was the only one found at the scene; that the property was totally secure; that the only other keyholders were out

13

> of town; and that the defendant was in significant debt at the time of
> the fire and subsequent commission of the charged crime of wire
> fraud.

(*Id.*) For all these reasons, the Government urges the Court to deny Defendant's motion. (*Id.* at

23.)

### c.  Defendant's Reply (Doc. 185)

Defendant begins,

> We agree with the Government that there was ample evidence
> presented to the jury that the cause of the fire was arson and not
> electrical; but, there was not ample evidence that Mr. Sam was lying
> when he said the fire was probably electrical. No one knew that the
> fire was arson on January 2, 2019.

(Doc. 185 at 1.) Hanover did not conclude it could have been arson until February 6, 2019. (*Id.*)

The Government also ignores Kemp's testimony that he may have mentioned that fire

needed to be ruled out in that phase of the investigation. (*Id.*) Kemp's testimony makes sense,

argues Defendant, given that the 911 caller said they heard a loud boom and that they thought a

transformer exploded. (*Id.* at 2.)

Likewise, the Government misleads when it says Dabit was the only one present during

the fire. (*Id.* at 2.) "There was no evidence put on as to who was present when the fire was set.

More inferences are that Mr. Sam claimed he slept through the explosion and that he did not smell

gasoline in the residence or the store itself." (*Id.*) Dabit's financial situation also requires inferences

to establish motive.

Defendant concludes this section:

> If two trained experts – Bo Roberts and Agent O'Brien – did not
> know it was arson for the first days and even weeks, how is it then
> Mr. Sam could know it was arson? The Government's original
> theory was that he knew it was arson because he set the fire. That
> theory has been soundly rejected. No one offered any proof of Sam's
> knowledge of the cause of the fire. Since Mr. Sam did not set the

14

fire, and since he was not made aware that it was arson until long after he made his call to Hanover, then he could not have made a false, material statement to them.

(*Id.* at 3.) Ultimately, "[t]here is not substantial evidence to support this verdict. No reasonable, logical jury could render this verdict." (*Id.* at 4.)

> d.  Government's Sur-Reply (Doc. 188)

In sur-reply, the Government first notes that Defendant ignores the other false statements he made in the scheme before turning to his central contention: that no one knew of the cause of the fire on January 2, 2019. (Doc. 188 at 1.) The Government responds, "the evidence and testimony showed that there was one person who knew all along how this fire began – the defendant." (*Id.*)

The Government next contends that the evidence shows that no one told defendant that the fire was "probably electrical," so that statement was false. (*Id.* at 1–2.)

> Given that the cause of the fire had not been determined by fire investigators as of January 2, it is inconceivable that anyone would have relayed a likely origin and cause opinion to the defendant on or before that date, and the testimony presented at trial firmly established that, in fact, no one did.

(*Id.* at 2.) According to the Government, the false statement to Hanover occurred *before* Defendant was interviewed on January 2, 2019, so Defendant made the statement before talking with O'Brien and Bo Roberts. (*Id.*) Indeed, Kemp, O'Brien, and Roberts all testified about the extensive systematic approach in fire investigations, which tends to negate anyone represented the fire was "probably electrical" before examining the scene, particularly when there was no evidence that the fire might have been electrical. (*Id.* at 2–3 & n.6.) The only possible people who could have made this statement are BRFD firefighters and Kemp. (*Id.* at 3.) But Defendant does not point to the firefighters. (*Id.*) Moreover, "Kemp unequivocally testified that, on the same day that he collected

three gas cans and smelled gasoline in the defendant's residence, it was certainly not his opinion that the fire was probably electrical, and he did not ever tell the defendant that the fire was probably electrical." (*Id.*)

Additionally, the Government says Defendant falsely relabels facts as inferences, but the following are facts brought out at trial:

> the layout of the defendant's property; the extensive security features throughout the entire property; the fact that the defendant was the only one present (and the only keyholder in town at the time of the fire); the fact that the defendant claimed to have slept through the explosion; the fact that the defendant denied smelling gasoline in the residence; and the fact that the defendant was facing a total outstanding debt of at least $1,285,108, with mounting credit card debt totaling more than $150,000 and many credit accounts that were at or near their limit.

(*Id.* at 3–4.) "The jury heard all of these *facts* and was entitled to draw reasonable *inferences* therefrom." (*Id.* at 4.) The Government reiterates that the Court is required to draw reasonable inferences in the Government's favor and assume the truth of its evidence. (*Id.* (citations omitted).)

Defendant claims that he "did not set the fire," but, according to the Government, he does so without discussing any evidence or reasonable inferences to be drawn therefrom. (*Id.*) Thus, Defendant has failed to meet his burden. (*Id.* at 4–5.)

The United States then turns to the Certified Fire Investigators, all three of whom concluded that (1) Defendant was "the only person who had keys to the numerous locked gates and doors on this secured property, [and who] even *could have* gained the access necessary to set this fire," and (2) there was no evidence to support Defendant's intruder theory. (*Id.* at 5.)

The United States then emphasizes the prior caselaw about inconsistent verdicts and how the not-guilty verdicts on Counts 1 and 2 are irrelevant to the guilty verdict on Count 3. (*Id.* at 6.)

The Government closes by hammering the standard: the "verdict must stand unless no rational juror could have found guilty beyond a reasonable doubt." (*Id.* at 7–8.)

## 2. Law and Analysis

To recap, the sole remaining question is whether there was sufficient evidence to support the verdict. *See* Fed. R. Crim. P. 29(a), (c)(1). That is, the issue is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Emordi*, 959 F.3d at 650 (citation omitted). Again, "[a]ll reasonable inferences and credibility choices must be made in support of the jury verdict." *DeJean*, 613 F.2d at 1358 (citation omitted). The Court "ask[s] only if the verdict was reasonable, not whether it was correct." *Emordi*, 959 F.3d at 650 (citing *Kuhrt*, 788 F.3d at 413).

Having carefully considered the matter, the Court will deny Defendant's motion. In short, the Court agrees with the Government's analysis that there was substantial evidence supporting the jury verdict.

Defendant's position rests on several false premises. First, Defendant argues that the jury's decisions on Counts 1 and 2 equate to a finding that he could not have started the fire or lied about the fire for purposes of Count 3. But, again, "an acquittal is not necessarily to be taken as the equivalent of a factual finding of innocence; nor does it necessarily reflect a failure of proof on the part of the prosecution." *Price*, 750 F.2d at 365 (citation omitted). Rather, this Court must "consider each count in a multi-count verdict separately, and a guilty verdict upon any count may stand, notwithstanding its inconsistency, provided it is supported by substantial evidence." *Id.* (citation omitted). Thus, no inferences can be drawn from what the jury concluded about Counts

1 and 2. *See Powell*, 469 U.S. at 64–66. The Court must look to the *evidence*, and Defendant offers little to contradict the considerable evidence highlighted in the Government's briefing.

Second, the Court also agrees with the Government that Defendant misinterprets the Government's burden on the wire fraud count. Defendant essentially contends that he should prevail because the Government failed to prove that he made false statements in his initial claim call to Hanover. But there are two problems with the argument.

For one, the Government provided substantial evidence that Defendant did in fact lie on this claim call and knew that the fire was not caused by electrical issues. Particularly relevant here is Kemp's testimony that neither he nor the incident commander communicated information about the cause of the fire and that it was unlikely he would do so:

> Q. So let me ask the question again. That same morning of the fire, when you had found and collected three gas cans and you had smelled gasoline in the Defendant's residence, was it your opinion that the fire was probably electrical?
>
> A. No, ma'am.
>
> Q. If that was not your opinion, would you have told this defendant that it was probably electrical?
>
> A. No, ma'am.
>
> Q. Did you ever tell the Defendant that the fire was probably electrical?
>
> A. No, ma'am.

(U.S. Sur-Reply Attach. A, Doc. 188-1 at 1; *see also* U.S. Attach. F, Doc. 184-6 at 2 (testifying that incident commander did not say this either).) Robinson contradicted Kemp's testimony, but, at this stage, "[a]ll reasonable inferences and credibility choices must be made in support of the jury verdict." *DeJean*, 613 F.2d at 1358.

Additionally, the Government exquisitely cataloged all of the evidence which supported its theory that the Defendant did in fact start the fire—and thus knew that the cause was not electrical. The Court will not repeat all of this evidence but merely highlights the following which the Court found particularly convincing:

(1) Defendant claimed he was "sleeping very deep," (U.S. Attach. H, Doc. 184-10 at 1), and did not know about the fire until firefighters breached the rear door and told him that the building was on fire and that he needed to escape, (U.S. Attach. F, Doc. 184-6 at 4), but it is reasonable to find this claim implausible given (a) the large explosion heard "two blocks away," (U.S. Attach. H, Doc. 184-10 at 6); and (b) the loud noise caused by first responders entering the property, which was "pretty loud" with "power tools running," "fire trucks coming in, . . . sirens and that sort of thing" making it "a very active scene," (U.S. Attach. J, Doc. 184-12 at 5 (Pourciau's description of the scene));

(2) Defendant had extensive security features on the property, from which a jury could reasonably infer that an intruder would have difficulty entering with a number of gas cans, (*see* U.S. Attach. A, Doc. 184-1, *in globo*; U.S. Attach. E, Doc. 184-5 at 7 (Roberts testifying that defendant denied problems with his security system); U.S. Attach. F, Doc. 184-6 at 14–15 (Kemp describing the property as "extremely fortified"); U.S. Attach. I, Doc 184-11 at 4–9 (Sullivan describing the efforts first respondents had to undertake to enter Sam's);

(3) Defendant had ready access through the security features with the keys in his pocket to open the locked doors, (U.S. Attach. F, Doc. 184-6 at 19–20);

(4) Defendant denied to Kemp that he could sense the "very overwhelming" smell of gasoline, (U.S. Attach. F, Doc. 184-6 at 6–7), and it is reasonable that the jury would not find Defendant's denial believable;

(5) The locations of the gas cans scattered throughout the warehouses support the conclusion that Defendant would have had a hand in their placement, (U.S. Attach. A, Doc. 184-1 at 2);

(6) Defendant's claim that Larry McGuffy was responsible for the fire could reasonably be found to be implausible given the facts that (a) Dabit described him on January 2, 2019, as a friend, (*see* U.S. Attach. F, Doc. 184-6 at 21–22); (b) Roberts did not see any place an arsonist could enter, (*id.* at 26–27); and (c) Roberts testified that the investigation revealed no evidence to support Defendant's theory, (*id.* at 42–43); and

(7) Defendant's considerable debt at the time of the fire of approximately $1.2 million dollars gave him a strong motive to commit the fraud, (U.S. Attach. K, Doc. 184-13 at 24).

Again, "[a]ll reasonable inferences and credibility choices must be made in support of the jury verdict." *DeJean*, 613 F.2d at 1358, and, under that standard, a reasonable jury could easily conclude that Defendant committed wire fraud by lying when he said the fire was "probably electrical" because he in fact knew the fire was caused by arson. As the Government argued in briefing:

> There was ample evidence upon which the jury could reasonably infer that the defendant was the only person with the access, opportunity and motive to burn down the warehouse portion of his business and to continue to make false and fraudulent statements throughout the subsequent investigation, in order to rake in hundreds of thousands of dollars in insurance proceeds to which he was not entitled.

(Doc. 184 at 22.) Given the fact that the Court "must affirm the verdict unless no rational juror could have found guilt beyond a reasonable doubt," *Waguespack*, 935 F.3d at 330 (citation omitted), Defendant's motion must be denied.

Defendant's argument about the claims call also falls because, even assuming the Government had failed to establish that Defendant lied during this call, that finding does not require an acquittal. Again, the Government had to prove, *inter alia*, (a) "That the scheme to defraud employed false material pretenses, promises, or representations;" and (b) "That the defendant transmitted or caused to be transmitted by way of wire communications, in interstate commerce, any writing, signal, or sound for the purpose of executing such scheme;" (U.S. Attach. B, Doc. 184-2 at 1–2.) Critically, the jury was instructed, "It is also not necessary that the government prove that the material transmitted by wire communications was itself false or

fraudulent, or that the use of the interstate wire communications facilities was intended as the specific or exclusive means of accomplishing the alleged fraud." (*Id.* at 3.)

Thus, even assuming the Government failed to point to substantial evidence that the Defendant's initial call contained false representations, the Government can still prevail by showing (a) "that defendant knowingly devised or intended to devise a scheme to defraud by means of false or fraudulent pretenses, promises or representations that was substantially the same as the one alleged in the indictment;" and (b) "that the use of the interstate wire communications facilities was closely related to the scheme because the defendant either wired something or caused it to be wired in interstate commerce in an attempt to execute or carry out the scheme." (*Id.*)

The Government met this burden. As explained above, a reasonable jury could easily have concluded that Dabit lied when he said (a) he could not smell the gas, (b) he slept through the fire, and (c) Larry McGuffy was responsible for the fire. Contrary to Defendant's position, each of these alleged lies is set out in the Amended Indictment as a false statement made in furtherance of the wire fraud. (*See Am. Indictment,* Doc. 64 at 4–6.) Moreover, the wire (claims call) was closely related to the scheme in that the call attempted to carry out the scheme. (U.S. Attach. B, Doc. 184-2 at 3.) On these additional grounds, Defendant's motion must be denied.

Third, Defendant's final false premise was that all of the evidence provided by Defendant requires the impermissible "piling of inference upon inference." (Doc. 179-1 at 13.) But the Court agrees with the Government that the Defendant's real complaint is the Government's reliance on circumstantial evidence. However, "[t]he law makes no distinction between the weight to be given either direct or circumstantial evidence." *United States v. Clark*, 506 F.2d 416, 418 (5th Cir. 1975) (cited with approval by Fifth Circuit Pattern Jury Instruction (Criminal), § 1.08 (2019)). "The government may prove its case by direct or circumstantial evidence, and the jury is free to choose

among reasonable constructions of the evidence." *United States v. Porras-Burciaga*, 450 F. App'x 339, 340 (5th Cir. 2011) (citing *United States v. Mitchell*, 484 F.3d 762, 768 (5th Cir. 2007)) (cited with approval by Pattern Instruction § 1.08, *supra*).

Thus, the key question is whether the inferences to be drawn from all of the circumstantial evidence highlighted above are reasonable. *See Waguespack*, 935 F.3d at 330 (stating that the Court "give[s] the party that convinced the jury the benefit of all reasonable inferences"); *Emordi*, 959 F.3d at 650 (stating that the Court "ask[s] only if the verdict was reasonable, not whether it was correct."). Having carefully considered the matter, and for all of the above reasons, the Court finds that the conclusions reached by the jury were reasonable.

In closing, the Court notes that this case was extremely well tried by all attorneys involved, through some of the best advocacy this Court has seen in nearly ten years on the bench. But, the Court's review here is "highly deferential to the verdict," and "[t]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. (citations omitted). As demonstrated above and in the Government's well-reasoned briefing, the United States has easily met that standard. Accordingly, Defendant's motion will be denied.

## IV. CONCLUSION

Accordingly,

**IT IS ORDERED** that the *Motion for Post Verdict Judgment of Acquittal Pursuant to Federal Rule of Criminal Procedure Rule 29* (Doc. 179) is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>May 23, 2024</u>.

_____

**JUDGE JOHN W. deGRAVELLES
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**